IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PRISONERS LEGAL ADVOCACY NETWORK, <br><br> Plaintiff, <br><br> v. <br><br> THE HONORABLE JOHN CARNEY, in his official capacity as Governor of the State of Delaware, THE HONORABLE ANTHONY J. ALBENCE, in his official capacity as State Election Commissioner of the Delaware Department of Elections, and, THE HONORABLE TERRA TAYLOR, in her official capacity as Acting Commissioner of the Delaware Department of Correction, <br><br> Defendants. | ) ) ) ) ) ) ) C.A. No. ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## **COMPLAINT**

The Delaware Constitution guarantees that people currently incarcerated at Delaware Department of Corrections ("DDOC") prison facilities have a fundamental right to vote unless they have been convicted of a felony and have not had their rights restored.[1] Yet today, the State of Delaware disenfranchises persons detained in DDOC prisons because they await trial ("pretrial detainees") or have been convicted of a non-disqualifying misdemeanor crime (together with pretrial detainees, "eligible incarcerated voters"). The Delaware Department of Elections

---

[1] The Delaware Constitution provides that a person is ineligible to vote only if (i) they were convicted of a felony and have not completed their sentence and have not received a pardon; or (ii) irrespective of whether their sentence is completed, they have been convicted of certain constitutionally enumerated felonies disqualifying them from voting, which are: murder, manslaughter, felonies constituting an offense against public administration involving bribery or improper influence or abuse of office, or felonies constituting a sexual offense. Del Const. Art. 5, § 2.

("DDOE") refuses to provide in-person machine voting options at DDOC prisons. And now, in light of a recent Delaware Supreme Court decision, eligible incarcerated voters cannot vote by absentee ballot, either. *Albence v. Higgin* ("*Higgin III*"), 295 A.3d 1065 (Del. 2022) (holding that categories of voters permitted to vote absentee under the Delaware Constitution, which does not include incarcerated voters, are comprehensive and may not be expanded). As such, Delaware now deprives Delaware's eligible incarcerated voters—unable to vote in-person or absentee—of *any* way to exercise their fundamental constitutional right to vote, thus violating the First and Fourteenth Amendments. Delaware also violates the Equal Protection Clause of the Fourteenth Amendment by arbitrarily creating different classes of similarly situated voters: those who are awaiting trial out on bail and who thus can vote, and pretrial detainees who are incarcerated and thus cannot. Absent immediate declaratory and injunctive relief, an entire class of eligible Delaware voters will be completely disenfranchised ahead of upcoming elections, including the November 2024 election. Plaintiff Prisoners Legal Advocacy Network ("PLAN") respectfully seeks such relief to ensure that these eligible incarcerated voters, who are among its members, do not lose their fundamental right to vote and suffer irreparable constitutional injury.

## JURISDICTION AND VENUE

1.    This is a civil rights action arising under 42 U.S.C. § 1983, as well as the First and Amendments to the United States Constitution.

2.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

3.    The  has personal jurisdiction over defendant Governor of the State of Delaware John Carney, whose principal office is in Dover, Delaware.

4.    The Court has personal jurisdiction over defendant Acting DDOE Commissioner Anthony J. Albence, whose principal office is in Dover, Delaware.

5.      The Court has personal jurisdiction over defendant Acting DDOC Commissioner Terra Taylor, whose principal office is in Dover, Delaware.

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b)(1) and (2) as the parties are all located in this District, and the acts and omissions giving rise to the claims all occurred in this District.

7.      Relief is proper under 28 U.S.C. §§ 2201 and 2202.

**PARTIES**

Plaintiff

8.      Plaintiff, PLAN,[2] is a New York-based nonprofit, nonpartisan coalition of jailhouse lawyers, attorneys, advocates, and partner organizations that provides legal services and support to incarceration system-impacted individuals. PLAN is registered to operate as a foreign nonprofit corporation in Delaware. PLAN uses a "prisoner-led" advocacy model, and currently and formerly incarcerated members play key roles in the organization's leadership and operations, including helping currently incarcerated people understand and exercise their rights. PLAN acts for and on behalf of both its members and recipients of its legal services who are incarcerated in DDOC prisons. PLAN's mission is to "defend and expand the legal rights of presently and formerly incarcerated individuals so that those who are directly impacted by the U.S. criminal legal system can live with dignity and without fear." PLAN, Mission Statement (attached as Exhibit 1).

Defendants

9.      Defendant, Governor John Carney, is the Governor of the State of Delaware.  Governor Carney is obligated by the Delaware Constitution to take care that the laws of Delaware are

---

[2] Lawyers for Equal Access to Advocacy & Dignity Incorporated is a New York not-for-profit corporation, which also operates as the Prisoners Legal Advocacy Network ("PLAN").

faithfully executed in accordance with the Delaware Constitution. Del. Const. Art. III, § 17. Governor Carney is also responsible for the appointment and removal of officers. *Id*.

10.     Defendant, State Election Commissioner Anthony Albence, is the Acting DDOE Commissioner for Delaware. Commissioner Albence's duties include "general supervision over the county directors, deputy county directors, and other employees of the DDOE in carrying out their respective duties and responsibilities." 15 Del. C. § 302(12). The DDOE is tasked with designating "conveniently located and readily accessible polling places" and procuring for those polling places the "necessary number of voting machines" and "everything else required" for the election.  15 Del. C. § 4512(d). Commissioner Albence is responsible for "supply[ing] necessary instruction and assistance to the [DDOE] and all registration and election officers in order to insure uniform operation of this title throughout the State." 15 Del. C. § 302(7). Commissioner Albence must "designate locations" for early voting, 15 Del. C. § 5402(a), and "determine whether early voting occurs by voting machine or paper ballot," 15 Del. C. § 5406.

11.     Defendant, Commissioner Terra Taylor (together with Defendant-Governor Carney and Defendant-Commissioner Albence, the "Defendants") is the Acting DDOC Commissioner. Commissioner Taylor is statutorily authorized and responsible for the oversight, operation, and administration of Delaware's correctional system and the Delaware prisons and is the chief executive and administrative officer of DDOC. 11 Del. C. §§ 6516, 6517. Commissioner Taylor has full and active charge of the DDOC and its facilities and services. 11 Del. C. § 6517.

## FACTUAL ALLEGATIONS

### Incarcerated Persons' Right to Vote in Delaware

12.    The Delaware Constitution guarantees the franchise of voters who are incarcerated either as pretrial detainees or who are incarcerated because of a misdemeanor conviction. *See* Del. Const. Art. V, § 2.

13.    Delaware's early voting period for the 2024 general election is scheduled to last for nine days. Delaware Department of Elections, *2024 Delaware Election Calendar*, at 11-12 (attached as Exhibit 2).

14.    Historically, Delaware has not provided in-person voting opportunities to eligible incarcerated voters. It has instead made provisions only for absentee ballots that generally must be mailed in from one of the four corresponding Delaware prisons where eligible incarcerated voters are housed. *See, e.g.*, Letter from Anthony Albence, State Election Commissioner, Delaware Department of Elections, to Dwayne J. Bensing, Legal Director, ACLU of Delaware (Sept. 20, 2022) (the "September 2022 DDOE Letter," attached as Exhibit 3). Upon information and belief, Delaware currently plans not to provide in-person machine voting opportunities, including during the 2024 elections, to eligible incarcerated voters.

### *Higgin*: Background, Decision, & Aftermath

15.    In June 2022, the Delaware legislature passed a statute that authorized all voters to cast their ballot by mail (the "vote-by-mail statute"). Immediately afterward, the statute was challenged in the Delaware Court of Chancery on the basis that the Delaware Constitution included specific, enumerated categories of voters authorized to cast absentee ballots and therefore precluded other such categories of voters from doing so. *See* Paul Kiefer, *Second Lawsuit Filed Against Delaware's vote-by-mail statute*, Delaware Public Media, (Aug. 1, 2022) (attached as Exhibit 4). The language in the Delaware Constitution reads:

> The General Assembly shall enact general laws providing that any qualified elector of this State, duly registered, who shall be unable to appear to cast his or her ballot at any general election at the regular polling place of the election district in which he or she is registered, either because of being in the public service of the United States or of this State, or his or her spouse or dependents when residing with or accompanying him or her because of the nature of his or her business or occupation, because of his or her sickness or physical disability, because of his or her absence from the district while on vacation, or because of the tenets or teachings of his or her religion, may cast a ballot at such general election to be counted in such election district.

Del. Const. Art. 5, § 4A.

16. On September 14, 2022, the Delaware Court of Chancery found that the 2022 vote-by-mail statute violated Art. 5, § 4A of the Delaware Constitution, holding that "the General Assembly may neither expand nor limit the categories of absentee voters identified in Article V, Section 4A." *Higgin v. Albence* ("*Higgin I*"), No. 2022-0641-NAC, 2022 WL 4239590, at *2, 23 (Del. Ch. Sept. 14, 2022), *aff'd in part, rev'd in part*, 2022 WL 5333790 (Del. Oct. 7, 2022).

17. Following *Higgin I*, in a letter dated September 16, 2022, the ACLU of Delaware, in partnership with Plaintiff and the Delaware State Conference of Branches of the NAACP, demanded that the State provide reasonable assurances that eligible incarcerated voters being held by DDOC be provided an opportunity to register to vote and vote in-person in the November 2022 elections, as "incarceration" was not an enumerated category for absentee voting under Article V, Section 4A of the Delaware Constitution. Letter from Dwayne J. Bensing, Legal Director, ACLU of Delaware, to Anthony Albence, State Election Commissioner, Delaware Department of Elections (Sept. 16, 2022) (attached as Exhibit 5).

18. In response, and without the guidance of a full opinion, the DDOE stated its view that *Higgin I* did not affect the ability of eligible incarcerated voters to vote by absentee ballot. The DDOE voiced that these voters could vote absentee under the "business or occupation" reason set

forth in Art. V. § 4A and reiterated that these voters "[would] *not* have access to a voting machine at a polling place." *See* Exhibit 3, September 2022 DDOE Letter (emphasis added).

19.     Subsequently, on October 6, 2022, the Supreme Court of Delaware on appeal issued an order affirming the Chancery Court's vote-by-mail ruling, declaring that Delaware's vote-by-mail statute "impermissibly expand[ed] the categories of absentee voters identified in Article V, Section 4A of the Delaware Constitution" and was therefore unconstitutional. *Albence v. Higgin* ("*Higgin II*"), No. 342, 2022, 2022 WL 5333790 (Del. Oct. 7, 2022).

20.     Following *Higgin II*, in a letter dated October 14, 2022, the ACLU of Delaware further demanded that the State provide reasonable assurances that eligible incarcerated voters held in DDOC prisons would not be arrested or prosecuted in the event they voted (or attempted to vote) in the November 2022 elections. Letter from Dwayne J. Bensing, Legal Director, ACLU of Delaware, to Kathy Jennings, Attorney General of Delaware (Oct 14, 2022) (attached as Exhibit 6). In the letter, the ACLU of Delaware warned that "the current status quo is untenable for incarcerated voters, who at this point are unable to vote in-person" and who required "a more comprehensive solution … in the long term to ensure that eligible incarcerated voters can adequately exercise their fundamental right to vote." *Id.* The letter also noted "around the country … a disturbing rise in the arrest and prosecution of voters—who lack any *mens rea* or intent to commit any crime—for voter fraud or improper voting, because those voters are confused about byzantine election laws." *Id.* The Delaware Department of Justice ("DDOJ") agreed, for purposes of the November 2022 election, not to prosecute voters who voted absentee from DDOC prisons. Letter from Patricia A. Davis, State Solicitor, Delaware Department of Justice, to Dwayne J. Bensing, Legal Director, ACLU of Delaware (Nov. 2, 2022) ("November 2022 DDOJ Letter ") (attached as Exhibit 7).

21.     On December 13, 2022, the Supreme Court of Delaware issued a full opinion on the vote-by-mail statute. *Higgin III*, 295 A.3d 1065 (Del. 2022). Although in the preceding order the State was only told that Delaware's vote-by-mail statute "impermissibly expand[ed] the categories of absentee voters," *Higgin II*, 2022 WL 5333790, at *1, the Delaware Supreme Court in its full opinion found that the historical record "compels the conclusion that the categories of voters identified in Section 4A constitute a comprehensive list of eligible absentee voters," such that "the legislature is impliedly prohibited from either abridging or enlarging those categories except by constitutional amendment," *Higgin III*, 295 A.3d. at 1092. Thus, because "incarceration" (or some equivalent) was not a category of voter identified in Section 4A, *Higgin III* foreclosed the DDOE's pre-opinion determination as applied to eligible incarcerated voters.

22.     In light of the *Higgin III* decision and concerned about the ability of eligible incarcerated voters to cast ballots particularly in the upcoming 2024 elections, and for those voters to know as well that their ballots would be validly counted, the ACLU of Delaware sent a demand to Defendants on October 4, 2023. Letter from Andrew Bernstein, Cozen Voting Rights Fellow, ACLU of Delaware, to John Carney, Governor, State of Delaware; Anthony Albence, State Election Commissioner, Delaware Department of Elections; and Terra Taylor, Acting Commissioner, Delaware Department of Correction (Oct. 4, 2023) (attached as Exhibit 8).

23.     As before the 2022 election, the ACLU of Delaware's demand put Defendants on notice that "Delaware must provide a constitutionally guaranteed mechanism for eligible incarcerated voters to vote in the upcoming 2024 elections," and that "a failure to provide necessary assurances [would] be considered an indication that the State does not intend to provide a path for the citizens to vote in the 2024 elections." *Id.*

24.     On October 26, 2023, DDOC responded, stating that DDOC "received guidance from the [DDOE] and [DDOJ], who have determined that incarcerated person absentee voting is permitted." Letter from Terra Taylor, Acting Commissioner, Delaware Department of Correction, to ACLU of Delaware (Oct. 26, 2023) ("October 2023 DDOC Letter", attached as Exhibit 9).

25.     On October 27, 2023, Defendant Albence responded, reiterating DDOE's position that the *Higgin III* decision "does not impact the ability of eligible voters who are incarcerated in Delaware prison facilities to vote by absentee ballot." Letter from Anthony Albence, State Election Commissioner, Delaware Department of Elections, to Andrew Bernstein, ACLU of Delaware (Oct. 27, 2023) ("October 2023 DDOE Letter", attached as Exhibit 10).

26.     Neither DDOC nor DDOE provided legal authority or support for these opinions.

27.     On November 29, 2023, the undersigned counsel, on behalf of Plaintiff, met with DDOC and DDOE seeking to remedy the constitutional deprivation eligible incarcerated voters would suffer in the 2024 general election absent their intervention (the "November 29 Meeting"). Despite PLAN expressing over a year ago concern about incarcerated voters' ability to vote absentee, DDOC and DDOE provided no controlling legal authority for their position that eligible incarcerated voters could vote by absentee ballot.  On information and belief, DDOC and DDOE instead cite only their recent absentee voting procedures, including a standalone absentee ballot form that pre-existed *Higgin* altogether. On information and belief, DDOE has not conducted any official studies considering the cost of in-person machine voting as opposed to absentee voting in DDOC prisons. On information and belief, neither DDOC nor DDOE have taken any steps, after *Higgin III,* to study the possibility of in-person machine voting in prisons.

28.     Delaware law permits that "the ballot of any elector choosing to vote by absentee ballot may be challenged" for being unlawfully cast or for making a false statement in a request for an

absentee ballot. 15 Del. C. § 5513(a).  Delaware law does not impose any limit on how many ballots may be the subject of an individual challenge (i.e., a citizen may challenge however many ballots they want).  Nor does Delaware law preclude the possibility of a blanket challenge if a particular group of voters is deemed ineligible.  The likelihood of a challenge to ballots cast absentee, as the State requires, by eligible incarcerated voters is thus not merely hypothetical.  Even if eligible incarcerated voters were not prosecuted for casting an absentee ballot post-*Higgin III*, they risk having any such absentee ballots challenged and invalidated under § 5513, which would result in disenfranchisement.

### PLAN's Delaware Voting Rights Work

29.     PLAN has provided legal services and support to individuals incarcerated in Delaware since February 2017. Generally, PLAN protects the franchise among eligible system-impacted voters by (i) administering the Election Protection Jail & Post-Release Voting Working Group in collaboration with coalition partners, (ii) coordinating efforts to inform currently and formerly incarcerated voters of their rights under the law, (iii) assisting eligible currently and formerly incarcerated voters ("system-impacted voters") in overcoming barriers they encounter in their exercise of these rights, and (iv) advocating for the expansion of voting rights for system-impacted people. PLAN also works with partners to develop "Know Your Rights" guides and provides consultations on voting initiatives for currently and formerly incarcerated voters.

30.     Among other initiatives, the Election Protection Jail & Post-Release Voting Working Group "informs presently and formerly incarcerated voters of their voting rights under the law, assists system-impacted voters in overcoming barriers they encounter in their exercise of these rights, and advocates for the expansion of these voting rights" and "develops Know Your Rights guides for system-impacted voters and provides them free of charge to eligible incarcerated and

formerly incarcerated voters." *Election Protection Jail & Post-Release Voting Working Group*, PLAN (attached as Exhibit 11).

31.    PLAN has specialized expertise that can help to bridge the gaps in knowledge that can exist where carceral officials lack deep knowledge of election procedures and election officials generally lack deep knowledge of correctional policies and procedures. By way of example, in 2022, DDOC provided PLAN with flyers used in DDOC facilities that—unbeknownst to DDOC—incorrectly informed incarcerated voters that they had more time to register absentee than they actually did. DDOC implicitly acknowledged its error via a revised flyer published with the identified registration date removed. Shortly after this, DDOE also disclosed to PLAN that not a single eligible incarcerated voter was able to successfully cast a ballot in the November 2020 election.  PLAN has the ability, when allowed, to provide specialist knowledge about how the policies of state agencies, like DDOC and DDOE, work, intersect, and impact eligible incarcerated voters.

### Post-*Higgin* Impact on PLAN and its Members

32.    The failure of the Defendants to implement in-person machine voting in Delaware prison facilities following the *Higgin III* has created mass confusion among eligible incarcerated voters and legal uncertainty for advocates advising eligible incarcerated voters about their rights. Because this confusion and uncertainty has increased the challenges eligible incarcerated voters face in looking to exercise their right to vote, PLAN has been forced to increase its investment in Delaware and allocate half of its 2024 overall voting rights budget to address Delaware's deprivation of eligible incarcerated voters' rights. Importantly, PLAN has spent significant time and resources engaging in a full-scale, corrective-messaging campaign. For example, PLAN has:

- Revised legal questionnaires and investigated incarcerated voter experiences. Like many organizations providing legal services to incarcerated persons, PLAN uses legal

questionnaires to assess the complaints of individual prisoners. Because of *Higgin III*, however, PLAN began a comprehensive investigation of the voting issues faced by incarcerated persons in Delaware. PLAN did so, in part, by developing an investigative questionnaire to request targeted information about voter access and voter experiences.

- <u>Revised presentations, materials and trainings for staff</u>. Because of the confusion, and uncertainty caused by the Defendants' failures to adjust course in light of *Higgin III*, PLAN's efforts to educate staff have been made more difficult, more costly, and more extensive. Most of PLAN's staff work for approximately 12-week placements. As part of these placements, PLAN staff are educated through various presentations, materials, and trainings about prisoners' rights generally. Because of the Defendants' failure to implement valid and lawful mechanisms for incarcerated voters to cast their ballots after *Higgin,* however, PLAN has had to revise its education strategy to provide more tailored information about the rights of incarcerated voters in Delaware and the disenfranchisement caused by the Defendants' inaction. PLAN now dedicates additional time and resources to educating staff specifically about the issues created by *Higgin* and the Defendants' failure to adequately address it, while simultaneously cautioning staff about the unpredictability of its impact and the difficulty of advising incarcerated persons as a result.

- <u>Revised guidance for incarcerated voters.</u>  PLAN has been required to expend additional resources in continuing to assess how best to explain to eligible incarcerated Delaware voters that they have a right to vote that they may not be able to exercise due to the Defendants' inaction; and PLAN is continuing to develop new, updated written guidance to ensure those voters are both aware of their rights and understand the risks that may be associated with exercising them because of the Defendants' failure to take steps to

implement in-person machine voting or afford incarcerated voters access to knowledgeable community advocates.

- <u>Adapted legal resource materials for jailhouse lawyers and incarcerated voters.</u> Prior to *Higgin,* PLAN's legal resource materials pertaining to incarcerated voters were developed solely for internal use by attorneys and law. Consequently, these materials did not require the more extensive writing and production steps necessary for publicly disseminated materials. As a result of the Defendants' failures to implement appropriate responses following *Higgin*, PLAN has needed to adapt these materials specifically for jailhouse lawyers and incarcerated voters in Delaware. This required (and continues to require) significantly more time because PLAN must prepare these materials for use by individuals with a wide range of both literacy levels and awareness of legal principles.

- <u>Invested in software to broaden accessibility to legal resource materials.</u> In connection with the above, and in order to ensure that incarcerated persons have sufficient access to the revised legal resource materials, PLAN has been forced to invest in software to create a robust and easily navigable online database to disseminate these materials.

- <u>Expanded publication of general voting rights resources</u>. Before Defendants refused to make provisions, following *Higgin III*, to allow in person machine voting for eligible incarcerated voters, PLAN had only made voting rights resources available to partners and advocates rather than the public because PLAN did not believe it necessary to incur the greater publication costs for public dissemination. Now, the Defendants' failure to allow in-person machine voting, with the resulting confusion and uncertainty, has forced PLAN to devote greater resources to provide public access to the materials since many incarcerated persons rely on family members and friends for pertinent voting information.

- <u>Increased the frequency of meetings</u>. Immediately after *Higgin III*, PLAN's supervising attorney introduced more regular (typically weekly) meetings for staff for the sole purpose of discussing the decision and the implications for eligible incarcerated voters in Delaware because of the Defendants' failure to implement lawful voting options following the decision.

33.     Approximately 29 of PLAN's 293 incarcerated members and 178 of PLAN's 1,184 incarcerated legal service recipients reside in DDOC prisons.[3] Upon information and belief, PLAN has members and legal service recipients currently and prospectively residing in DDOC prisons who wish to vote in 2024. Absent an injunction, members and legal service recipients who are residing in DDOC prisons at the time of the November 2024 election will be unable to vote lawfully and have their ballots counted.

34.     The work of some PLAN members, including prison paralegals and jailhouse lawyers, has been radically altered due to the Defendants' failure to protect the franchise for incarcerated Delaware voters following *Higgin*. Consequently, PLAN's members are now unable to effectively advise eligible incarcerated persons about the ballot casting process with reasonable certainty that those ballots will be valid or counted.

35.     Therefore, PLAN, its current and prospective members, and its current and prospective legal service recipients' work, rights, and investments in Delaware are all at risk because of the State's failure to provide a mechanism for in-person machine voting after *Higgin III*.

### <u>General Delaware Detention Statistics</u>

36.     Upon information and belief, a substantial number of incarcerated individuals will be eligible to vote during the 2024 general election voting period.

---

[3] These figures are not exclusive, as a member of PLAN can also be a legal service recipient.

37.     Failing to provide a constitutionally valid mechanism for these eligible incarcerated voters to cast ballots will foreclose a substantial population of citizens from being able to participate in the democratic process by exercising their fundamental right to vote.

38.     In 2022, people incarcerated for misdemeanors and pretrial detention constituted 38% of the population housed in DDOC Level 5 prison facilities (where both sentenced inmates are held and offenders awaiting trial, hearing or sentencing and offenders are detained). Delaware Department of Correction, Annual Report [2022], 20 (the "DDOC 2022 Annual Report," attached as Exhibit 12).

39.     As of October 12, 2023, DDOC was incarcerating 1,289 people on pretrial detention alone. October 2023 DDOC FOIA Response ¶ 12 (attached as Exhibit 13). This figure does not include those incarcerated for misdemeanor convictions.

40.     The early voting period for the 2024 general election begins on October 25, 2024, and Election Day is November 3, 2024. Delaware Department of Elections, Exhibit 2 at 11-12. The entire voting period for the 2024 general election is therefore ten days—nine days of early voting and Election Day.

41.     According to DDOC's Annual report, "detentioners" (pretrial detainees) spend, on average, roughly 1.3 months in detention, and "jail inmates" (persons convicted of a misdemeanor) face detention periods of more than three months on average. Exhibit 12 at 22.

42.     Therefore, a substantial number of eligible incarcerated voters in Delaware will lose their fundamental right to vote if the State continues to refuse to establish a mechanism for in-person machine voting for eligible incarcerated voters.

**Delaware's Cash Bail System and its Effects on System-Involved Voters**

43.     Delaware has a bail system, which refers to "the amount of money a defendant must post to be released from custody until their trial is heard." Delaware Courts, *Bail & Bail Bonds*, (attached as Exhibit 14).

44.     One form of bail is "cash only" bail, where "[t]he defendant, or someone on his/her behalf, must pay the Court a designated amount of money in order to be released." *Id*. Another form of bail is "secured bail," where "[t]he defendant must pay the Court a designated amount of money or post security in the amount of the bail in order to be released. This security can be in the form of cash or property…" *Id*.

45.     More than 83% of individuals charged with crimes enumerated under the recent bail reform law, Senate Bill 7, face either cash only bail or secured bail, both of which condition release on some sort of payment.

46.     Pretrial detention disproportionately impacts minority communities in the United States, with young Black men 50% more likely to be detained pretrial than their white counterparts. This is separate and apart from the fact that Black and Brown defendants generally receive bail amounts twice as high as white defendants. Wendy Sawyer, *How race impacts who is detained pretrial*, Prison Policy Initiative (Oct. 9, 2019) (attached as Exhibit 15).

47.     The same is true in Delaware. A 2011 study found that Black and Hispanic Delaware persons were more likely to be detained for any period between arrest and final disposition across five different "crime groups." For each crime group, approximately 90% of Hispanic and Black people were held in custody at some time between arrest and disposition where only about 70% of white people were. The Criminal Justice Statistical Review Committee, *Race and Incarceration in Delaware: A Report to the Delaware General Assembly*, (June 30, 2011) (attached as Exhibit 16). Although only 23.8% of Delawareans are Black, Black people made up more than 60% of all

16

people incarcerated on pretrial detention as of October 12, 2023. Black defendants charged with crimes enumerated under Senate Bill 7, a recent bail reform law, are also likelier to have cash bail imposed than white defendants. Statistical Analysis Center, *Pretrial Modernization Review*, at 6, (Jan. 2023) (attached as Exhibit 17).

<u>**Existing Avenues For Incarcerated Voter Enfranchisement**</u>

48.     Where in-person voting opportunities have been provided to incarcerated voters, they are enthusiastically used. *See generally* Naila Awan, *Jail-based polling locations: A way to fight voter disenfranchisement*, Prison Policy Initiative (Oct. 25, 2022) (attached as Exhibit 18). For example, during the 2022 Chicago primary elections, the turnout percentage at the Cook County Jail polling location was higher than that of the rest of the city. *Id*. More than 2,000 individuals in the jail—about 37% of the jail's population—voted in that election. *Id*. About 25% of the detainees at the Cook County jail voted in the June 2022 primary, compared to less than 7% who voted during the 2018 primary election when only absentee voting was available for those voters. *Id*.

49.     PLAN has special expertise in administering on-site jail polling places. PLAN has co-authored a jail voting toolkit with the NAACP Legal Defense Fund. Upon its release, this toolkit will advise advocates, prison officials, and elections officials about the process for establishing and administering on-site polling places in carceral facilities. PLAN also recently consulted on the piloting of a planned polling place in a California carceral facility.

50.     Importantly, expanding system-impacted voter participation is in the public interest, as voting is also related to reduced recidivism. Kristen M. Budd & Niki Monazzam, *Increasing Public Safety by Restoring Voting Rights*, The Sentencing Project (Apr. 25, 2023) (attached as Exhibit 19). In-person machine voting can also be an important tool for Defendant Taylor, who is also required to provide for the "correction and rehabilitation of persons committed to the [DDOC]." 11 Del. C. § 6517(3).

51.     Jurisdictions in at least four other states, as well as the District of Columbia, have implemented jail-based polling locations. *See* Exhibit 18.

**Voter Challenges, Arrests, and Prosecutions Around the United States**

52.     Voter challenges are on the rise in the United States. For example, 22,000 absentee ballots were challenged in Michigan ahead of the 2022 general election; more than 6,000 voters had their voter eligibility challenged in Harris County, Texas ahead of the 2022 general election; and 360,000 voters were challenged ahead of Georgia's Senate runoff elections in 2021. Nick Corasaniti & Alexandra Berzon, *Activists Flood Election Offices With Challenges*, N.Y. Times, (Sept. 28, 2022) (attached as Exhibit 20). As noted *supra*, such mass voter challenges are expressly authorized by Delaware law. 15 Del. C. § 5513.

53.     Delaware law also appears to affirmatively *require* prosecution of certain election law violations. *See* 15 Del. C. § 5102(a) ("The Attorney General shall immediately prosecute to final judgment all complaints which may be made of a violation of this title.").

54.     States around the country have also been regularly and increasingly prosecuting voters—especially voters who have previously been arrested, charged with, or convicted of crimes—for trying to vote, even when those voters have made good-faith mistakes as to their voting eligibility due to confusion about rights restoration procedures under state law. *See, e.g.*, Brennan Center for Justice, *10 Reasons Courts Should Toss Florida's Flimsy Voter Fraud Prosecutions*, (Nov. 7, 2022) (attached as Exhibit 21).

55.     States that have engaged in these sorts of voter prosecutions recently include Florida (*id.*); Texas, (Christopher Uggen *et al.*, *Locked Out 2022: Estimates of People Denied Voting Rights*, The Sentencing Project (Oct. 25, 2022), discussing prosecution of Texas resident sentenced to five years in prison for attempting to vote while ineligible, despite her lack of knowledge) (attached as Exhibit 22); Tennessee, (*id.*) (discussing prosecution of Black Lives Matter activist

sentenced to six years in prison for illegally registering to vote despite her lack of knowledge); North Carolina, (Exhibit 23, Jack Healy, *Arrested, Jailed, and Charged With a Felony. For Voting* N.Y. Times (Aug. 2, 2018); Minnesota, (Melissa Turtinen, *5 Minnesotans charged, accused of voter fraud*, Bring Me The News Minnesota (Dec. 30, 2021), describing prosecution of returning citizen who did not know her voting rights were not fully restored) (attached as Exhibit 24); and Georgia, Georgia Secretary of State, *State Election Board Refers Voter Fraud Cases for Prosecution* (Sept. 11, 2020) (attached as Exhibit 25).

56.     In Florida, for example, the Office of Statewide Prosecution brought prosecutions against 19 returning citizens—15 of whom were Black—for purported voter fraud when publicly available evidence indicates that those voters were genuinely confused and/or misled about their voter eligibility. *See* Brief of *Amici Curiae* American Civil Liberties Union et al., *State of Florida v. Miller*, No. 3D22-2180, at 20-25 (3d Dist. Fla. Sept. 25, 2023) (attached as Exhibit 26). Elections officials in Florida have stated that they have received an unprecedented number of *eligible* voters calling them "concerned that they may be prosecuted or what have you for voter fraud," in light of these arrests and prosecutions.  News Service of Florida, *Florida elections officials grapple with misinformation, myths*, Tampa Bay Times (Oct. 26, 2022), attached as Exhibit 27.  *See also* Exhibit 26 at 20-25.

57.     A Delaware eligible incarcerated voter's reasonable fear that casting an absentee ballot may result in a challenge or prosecution will continue to chill citizens from exercising their right to vote unless the State adopts a mechanism that provides these voters the opportunity to cast a ballot in person by voting machine.  The current climate in Delaware surrounding voting in jail or detention—a complex environment of threat, confusion, and fear—has been found to lead to *de facto* disenfranchisement of otherwise eligible voters in other states. *See supra*; *see also generally*

Erika Wood and Rachel Bloom, *De Facto Disenfranchisement*, American Civil Liberties Union and Brennan Center for Justice, (2008) (attached as Exhibit 28).

## FIRST CLAIM FOR RELIEF

**Denial of the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments to the Constitution; 42 U.S. § 1983**

58.     Plaintiff realleges and incorporates herein by reference every allegation and paragraph previously set forth.

59.     The right to vote is protected through the U.S. Constitution under both the Equal Protection Clause of the Fourteenth Amendment and the First Amendment. State election laws may not place burdens upon a plaintiff's First and Fourteenth Amendment right to vote unless relevant and legitimate state interests of sufficient weight necessarily justify the magnitude and character of the burdens imposed.

60.     Voters in Delaware may only vote via absentee ballot if they are found to fall within a category of voters listed in Art. 5, § 4A of the Delaware Constitution.

61.     "Incarceration" is not listed in Art. 5, § 4A of the Delaware Constitution as a valid basis for voters to cast an absentee ballot.

62.     Defendants provide no in-person opportunity for eligible incarcerated voters to cast a ballot by voting machine.

63.     Therefore, Delaware fails to provide eligible incarcerated voters with a constitutional means by which to exercise their right to vote. Eligible incarcerated voters in DDOC prisons are currently *totally* disenfranchised for upcoming elections, including the November 2024 election. Total disenfranchisement is a *per se* severe burden on the right to vote.

64.     The burdens imposed by Delaware law are not necessary to achieve, nor are they reasonably related to, any sufficiently weighty state interest. These burdens imposed by Delaware law accordingly lack any constitutionally adequate justification and must be enjoined.

65.     Defendants' actions, taken under color of state law, deprive Plaintiff PLAN, its members (both existing and prospective), and the persons on whose behalf it advocates of the rights, privileges, or immunities secured to them by the Constitution of the United States, in violation of 42 U.S.C. § 1983.

## SECOND CLAIM FOR RELIEF

**Unconstitutional Discrimination in Violation of the Equal Protection Clause; 42 U.S.C. § 1983**

66.     Plaintiff realleges and incorporates herein by reference every allegation and paragraph previously set forth.

67.     The Equal Protection Clause guarantees qualified voters a right to participate equally with other qualified voters in the electoral process.

68.     Delaware's statutory scheme arbitrarily creates two classes of similarly situated voters: those who are awaiting trial on criminal release and thus can vote and pretrial detainees who are incarcerated and thus cannot. This arbitrary discrimination violates the Equal Protection Clause.

69.     The current scheme also amounts to an unconstitutional *de facto* wealth classification because of Delaware's cash bail system, in which criminal defendants frequently are required to post monetary bail in order to be released from custody until their trial is heard. Under current Delaware law, an individual awaiting trial who can afford bail has the ability to vote, while a similarly situated individual awaiting trial for the same crime who cannot afford bail does not have the ability to vote. This classification is arbitrary and irrational.

70.     Defendant's actions, taken under color of state law, deprive Plaintiff PLAN, its members (both existing and prospective) and the persons upon whom it advocates of rights, privileges, or immunities secured to them by the Constitution of the United States, in violation of 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A.      Declaring that Delaware's laws and policies deprive eligible incarcerated voters from having access to a constitutional means by which to cast a ballot in violation of the First and Fourteenth Amendments to the United States Constitution;

B.      Temporarily and/or permanently enjoining Defendants from impeding eligible incarcerated individuals' fundamental right to vote and requiring Defendants to provide such individuals with constitutional access to the ballot;

C.      Requiring DDOE and DDOC to collaborate to provide accessible, in-person machine voting opportunities for eligible incarcerated individuals;

D.      Awarding such damages as may be proven;

E.      Granting Plaintiff's attorneys' fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988; and

F.      Granting such other and further relief that the Court may determine to be necessary or proper.

OF COUNSEL:

Dwayne Bensing

AMERICAN CIVIL LIBERTIES UNION
 OF DELAWARE
100 W 10th St #706,
Wilmington, DE 19801
(302) 654-5326

Jonathan Topaz
Casey Smith
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 249-2500

Stephen D. Hibbard
Aaron M. Francis
Seth H. Victor
Dixie M. Morrison
PROSKAUER ROSE LLP
2029 Century Park E. #2400
Los Angeles, CA 90067
(310) 284-5600

Michael J. Lebowich
Godfre O. Blackman
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000

Dated: December 7, 2023

/s/ Emily S. DiBenedetto
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Plaintiff*