IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRISONERS LEGAL ADVOCACY NETWORK, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 23-1397-MN |
| THE HONORABLE JOHN CARNEY, in his official capacity as Governor of the State of Delaware, THE HONORABLE ANTHONY J. ALBENCE, in his official capacity as State Election Commissioner of the Delaware Department of Elections, and, THE HONORABLE TERRA TAYLOR, in her official capacity as Acting Commissioner of the Delaware Department of Correction | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**OPENING BRIEF IN SUPPORT OF
PLAINTIFF'S MOTION FOR EARLY PRELIMINARY INJUNCTION HEARING
DATE, PRELIMINARY INJUNCTION, AND TEMPORARY RESTRAINING ORDER**

OF COUNSEL:
Jonathan Topaz
Casey Smith
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 249-2500

Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Plaintiff*

*-and-*

Stephen D. Hibbard
Aaron M. Francis
Seth H. Victor
Dixie M. Morrison
PROSKAUER ROSE LLP
2029 Century Park E. #2400
Los Angeles, CA 90067
(310) 284-5600

Michael J. Lebowich
Godfre O. Blackman
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000

Dwayne Bensing (No. 6754)
AMERICAN CIVIL LIBERTIES UNION
 OF DELAWARE
100 W. 10 Street, Suite 706
Wilmington DE 19801
(302) 295-2113
dbensing@aclu-de.org

Dated: December 15, 2023

## TABLE OF CONTENTS

**Page(s)**

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................1

SUMMARY OF THE ARGUMENT ...........................................................................................1

FACTUAL BACKGROUND ........................................................................................................2

ARGUMENT .................................................................................................................................7

I.      PLAINTIFF HAS A REASONABLE PROBABILITY OF
        SUCCESS ON THE MERITS ..........................................................................................7

        A.      Plaintiff has a reasonable probability of success on its
                right-to-vote claim ...............................................................................................7

        B.      Plaintiff has a reasonable probability of success on its
                Equal Protection claim .......................................................................................13

II.     PLAINTIFF WILL SUFFER IRREPARABLE INJURY IF
        THIS COURT DOES NOT PROVIDE INJUNCTIVE RELIEF ....................................16

III.    THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF...........................................17

IV.     A PRELIMINARY INJUNCTION WILL SERVE THE
        PUBLIC INTEREST ......................................................................................................19

CONCLUSION............................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*ACLU v. Reno*,
   31 F. Supp. 2d 473 (E.D. Pa. 1999) ...................................................16

*Albence v. Higgin*,
   No. 342, 2022 WL 5333790 (Del. Oct. 7, 2022) ................................4, 18

*Albence v. Higgin*,
   295 A.3d 1065 (Del. 2022) ..................................................... passim

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ..............................................................8

*Ariz. Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) .....................................................17

*Bost v. Ill. State Bd. of Elections*,
   No. 22-cv-02754, 2023 WL 4817073 (N.D. Ill. Jul. 26, 2023) ..................12

*Brakebill v. Jaeger*,
   932 F.3d 671 (8th Cir. 2019) ......................................................16

*Bridgeville Rifle & Pistol Club, Ltd. v. Small*,
   176 A.3d 632 (Del. 2017) .........................................................10

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ..............................................................8

*Bush v. Gore*,
   531 U.S. 98 (2000) ...............................................................13

*Const. Party of Pa. v. Cortes*,
   877 F.3d 480 (3d Cir. 2017).........................................................8

*Council of Alt. Political Parties v. Hooks*,
   121 F.3d 876 (3d Cir. 1997).......................................................16

*Crawford v. Marion Cnty.*,
   553 U.S. 181 (2008) (Scalia, J., concurring) ...........................9, 13, 15, 16

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
   No. CV 81-03876, 2016 WL 6584915 (D.N.J. Nov. 5, 2016)..................16

*Election Integrity Project Cal. v. Weber*,
    Case No. 2:21-cv-00032-AB-MAA, 2023 WL 5357722 (C.D. Cal. Jul. 18,
    2023) ..............................................................................................................12

*Fair Fight Action, Inc. v. Raffensperger*,
    634 F. Supp. 3d 1128 (N.D. Ga. 2022) ............................................................9

*Firearms Policy Coal. Second Amend. Def. Comm. v. Harris*,
    192 F. Supp. 3d 1120 (E.D. Cal. 2016) ..........................................................19

*Fish v. Kobach*,
    840 F.3d 710 (10th Cir. 2016) .......................................................................17

*Frank v. Walker*,
    819 F.3d 384 (7th Cir. 2016) ...........................................................................9

*Gilliam v. Foster*,
    63 F.3d 287 (4th Cir. 1995) ...........................................................................17

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) .......................................................................17

*Griffin v. Illinois*,
    351 U.S. 12 (1956)..........................................................................................15

*Harper v. Va. Bd. of Elections*,
    383 U.S. 663 (1966)......................................................................13, 14, 15, 16

*Higgin v. Albence*,
    No. 2022-0641-NAC, 2022 WL 4239590 (Del. Ch. Sept. 14, 2022), *aff'd in
    part, rev'd in part*, 2022 WL 5333790 (Del. Oct. 7, 2022) ..............................3

*Ickes v. Whitmer*,
    No. 1:22-cv-817, 2022 WL 4103030 (W.D. Mich. Sept. 8, 2022).................12

*Ill. Bd. of Elec. v. Socialist Workers Party*,
    440 U.S. 173 (1979).......................................................................................7-8

*Johnson v. Governor of State of Fla.*,
    405 F.3d 1214 (11th Cir. 2005) (en banc) .....................................................15

*Jones v. DeSantis*,
    410 F. Supp. 3d 1284 (N.D. Fla. 2019), *aff'd*, 950 F.3d 795 (11th Cir. 2020)......................11

*League of Women Voters of Mo. v. Ashcroft*,
    336 F. Supp. 3d 998 (W.D. Mo. 2018) ..........................................................19

*League of Women Voters of N.C. v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014) ...............................................................16, 19

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) .........................................................................19

*M.L.B. v. S.L.J.,*
  519 U.S. 102 (1996).......................................................................................15

*Mays v. LaRose,*
  951 F.3d 775 (6th Cir. 2020) .........................................................................9

*Mazo v. N.J. Sec'y of State,*
  54 F.4th 124 (3d Cir. 2022), *cert. denied,* 2023 WL 7377826
  (U.S. Oct. 2, 2023) ..........................................................................................8

*McDonald v. Bd. of Elec. Comm'rs of Chicago,*
  394 U.S. 802 (1969).......................................................................................18

*Montgomery v. Whidbee,*
  446 F. Supp. 3d 306 (M.D. Tenn. 2020)........................................................9

*O'Brien v. Skinner,*
  414 U.S. 524 (1974)...............................................................................8, 9, 14

*Obama for Am. v. Husted,*
  697 F.3d 423 (6th Cir. 2012) .......................................................................16

*Ohio State Conf. of NAACP v. Husted,*
  768 F.3d 524 (6th Cir.), *vacated on other grounds,* 2014 WL 10384647
  (6th Cir. Oct. 1, 2014)...........................................................................10, 13

*Pub. Integrity All., Inc. v. City of Tucson,*
  836 F.3d 1019 (9th Cir. 2016) .......................................................................9

*Reylek v. Albence,*
  No. K22M-07-010 NEP, 2023 WL 4633411 (Del. Super. Ct. July 19, 2023)........................11

*Reynolds v. Sims,*
  377 U.S. 533 (1964).......................................................................................13

*Rosario v. Rockefeller,*
  410 U.S. 752 (1973).........................................................................................9

*Soltysik v. Padilla,*
  910 F.3d 438 (9th Cir. 2018) .......................................................................12

*United States v. Bell*,
   414 F.3d 474 (3d Cir. 2005)..................................................................................7

*United States v. Berks Cnty., Pa.*,
   277 F. Supp. 2d 570 (E.D. Pa. 2003) ..................................................................16

*United States v. Georgia*,
   892 F. Supp. 2d 1367 (N.D. Ga. 2012) ...............................................................17

*United Utah Party v. Cox*,
   268 F. Supp. 3d 1227 (D. Utah 2017)..................................................................17

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981)................................................................................................7

*Wesberry v. Sanders*,
   376 U.S. 1 (1964)..............................................................................................8, 9

STATUTES

42 U.S.C. § 1983 ............................................................................................................1

15 Del. C. § 51 .............................................................................................................11

15 Del. C. § 5513 .......................................................................................................5, 6

OTHER AUTHORITIES

U.S. CONST. amend. I.....................................................................................................1

U.S. CONST. amend. XIV ...............................................................................1, 9, 14, 17

Del. Const. Article 5, § 2 ...............................................................................................2

Del. Const. Article 5, § 4A .................................................................................. passim

## NATURE AND STAGE OF THE PROCEEDINGS

On December 7, 2023, Plaintiff filed this lawsuit alleging that Defendants' actions, taken under the color of state law, deprive Plaintiff and its members of rights, privileges, or immunities in violation of 42 U.S.C. § 1983, the First and Fourteenth Amendments to the Constitution, and the Equal Protection Clause. Plaintiff now moves for a preliminary injunction.

## SUMMARY OF THE ARGUMENT

Right now, the State of Delaware is denying the constitutionally guaranteed right to vote to an entire class of eligible Delaware voters—people incarcerated while awaiting trial ("pretrial detainees") and people incarcerated on misdemeanor convictions (together with pretrial detainees, "eligible incarcerated voters"). Preliminary injunctive relief is necessary to ensure that eligible incarcerated voters in Delaware's prisons can exercise their fundamental right to vote in upcoming elections, including the November 2024 general election. Defendants concede that these eligible voters have the right to vote. Yet these voters have no lawful way to exercise their fundamental right. They cannot vote in person, as the State refuses to offer in-person, machine-voting opportunities in its prisons. And now, there is no lawful alternative way for eligible incarcerated voters to exercise their fundamental right because they do not belong to one of the Delaware Constitution's enumerated list of categories for permitted absentee voting, which, as the Delaware Supreme Court has now held, is "exhaustive." *Albence v. Higgin* ("*Higgin III*"), 295 A.3d 1065, 1092 (Del. 2022). Even if these voters were to complete an absentee ballot, they would risk possible felony prosecution and the prospect of having their ballot invalidated.

These eligible incarcerated voters are now *completely* disenfranchised—unable to vote in-person or absentee. This disenfranchisement violates the fundamental right to vote that the U.S. Constitution guarantees. It also violates the Equal Protection Clause of the Fourteenth Amendment

because it creates two classes of otherwise identical voters—individuals awaiting trial residing outside of prisons who can vote, and individuals awaiting trial held in prisons who cannot. Moreover, given Delaware's reliance on a cash bail system, this amounts to an unconstitutional *de facto* wealth classification for access to the franchise, where individuals who are able to pay can vote and those who cannot pay cannot vote. Ahead of important federal and state elections, Delaware's eligible incarcerated voters have been disenfranchised in violation of their constitutional rights. Plaintiff respectfully requests this Court grant a preliminary injunction to ensure that the fundamental right to vote is restored to these citizens.

## **FACTUAL BACKGROUND**

The Constitution of the State of Delaware guarantees that all citizens have the right to vote, unless they are serving a felony sentence or have been previously convicted of a permanently disenfranchising felony. Del. Const. Art. 5, § 2. People on pretrial detention and people convicted of misdemeanors, like other Delaware citizens, are therefore "entitled to vote." *Id*. The State of Delaware has recognized this and does not dispute that eligible incarcerated voters have a constitutional right to vote. *See generally* Exs. 1-4[1]. Unlike some other jurisdictions, however, Delaware has chosen not to permit in-person machine voting for eligible incarcerated voters. *See* Ex. 8 (detailing that such mechanisms have been successfully implemented in other jurisdictions). Instead, Delaware only allows eligible incarcerated voters to complete absentee ballots. *See, e.g.*, Ex. 1. Now, in light of the Delaware Supreme Court's recent decision in *Higgin III*, the opportunity to vote by absentee ballot has been foreclosed. Eligible incarcerated voters now have no lawful

---

[1] References to exhibits are to the exhibits attached to the Declaration of Emily S. DiBenedetto, filed concurrently herewith (hereinafter referred to as "Ex. __").

way to exercise their right to vote unless the State of Delaware acts to permit them to vote in-person by voting machine.

In June 2022, Delaware's General Assembly passed a statute that authorized all voters to cast a ballot by mail (the "vote-by-mail statute"). After a constitutional challenge, Delaware's Court of Chancery found that the statute violated Art. 5, § 4A, holding that "the General Assembly may neither expand nor limit the categories of absentee voters identified in Article V, Section 4A"[2] and that the "attempt to expand absentee voting to Delawareans who do not align with any of Section 4A's categories must be rejected." *Higgin v. Albence* ("*Higgin I*"), No. 2022-0641-NAC, 2022 WL 4239590, at *2, 23 (Del. Ch. Sept. 14, 2022), *aff'd in part, rev'd in part*, 2022 WL 5333790 (Del. Oct. 7, 2022).

Following *Higgin I*, the ACLU of Delaware, in partnership with Plaintiff and the Delaware State Conference of Branches of the NAACP, demanded that the Delaware Department of Elections ("DDOE") provide reasonable assurances that eligible voters then being held by the Department of Correction ("DDOC") would be offered a chance to register and vote in person, as "incarceration" is not a category enumerated in Article V, Section 4A of the Delaware Constitution. Ex. 7. In response, and without the guidance of a full opinion, DDOE interpreted the court's order as not affecting the ability of eligible incarcerated voters in Delaware facilities to vote by absentee ballot. *See* Ex. 1. DDOE determined that these voters may vote absentee under Art. V. § 4A's "business or occupation" category and stated that these voters "will not have access to a voting machine at a polling place." Ex. 1.

---

[2] The Delaware Constitution enumerates categories of voters who may cast absentee ballots by mail because of the following reasons: 1) "being in the public service of the United States or of this State" (or spouse/dependent); 2) business or occupation; 3) sickness or physical disability; 4) vacation; or 5) tenets or teachings of his or her religion. Del. Const. Art. 5, § 4A.

3

On October 7, 2022, the Delaware Supreme Court affirmed the Court of Chancery's vote-by-mail ruling, declaring that Delaware's vote-by-mail statute "impermissibly expand[ed] the categories of absentee voters identified in Article V, Section 4A of the Delaware Constitution" and was therefore unconstitutional. *Albence v. Higgin* ("*Higgin II*"), No. 342, 2022 WL 5333790, at *1 (Del. Oct. 7, 2022). Days later, in an October 14, 2022, letter, the ACLU of Delaware demanded that the State provide reasonable assurances that eligible incarcerated voters held in DDOC facilities would not be arrested or prosecuted if they sought to vote in the November 2022 elections. Ex. 5. The ACLU of Delaware also said that the current status quo "is untenable for incarcerated voters," and that "a more comprehensive solution is needed … to ensure that eligible incarcerated voters can adequately exercise their fundamental right to vote." *Id*. In response, Delaware Department of Justice ("DDOJ") said it would not prosecute voters who voted absentee from DDOC facilities in the November 2022 election. *See* Ex. 4.

On December 13, 2022, the Delaware Supreme Court issued a full opinion on the vote-by-mail statute. *Higgin III*, 295 A.3d. 1065. While the Delaware Supreme Court's initial October 7 order ruled simply that Delaware's vote-by-mail statute "impermissibly expand[ed] the categories of absentee voters," *Higgin II*, 2022 WL 5333790, at *1, its December 13 decision found that the historical record "compels the conclusion that the categories of voters identified in Section 4A constitute a comprehensive list of eligible absentee voters," such that "the legislature is impliedly prohibited from either abridging or enlarging those categories except by constitutional amendment," *Higgin III*, 295 A.3d. at 1092.

Nearly a year later, with the State not having communicated any steps it had taken to ensure that eligible incarcerated voters can cast ballots in light of *Higgin III*, the ACLU of Delaware sent another demand to Defendants on October 4, 2023. Ex. 6. The demand put Defendants on notice

that "Delaware must provide a constitutionally guaranteed mechanism for eligible incarcerated voters to vote in the upcoming 2024 elections" and that a "[f]ailure to provide necessary assurances [would] be considered an indication that the State does not intend to provide a path for these citizens to vote in the 2024 elections." *Id.* On October 26, 2023, DDOC responded, stating that DDOC "received guidance from the [DDOE] and the [DDOJ], who have determined that incarcerated person absentee voting is permitted." Ex. 2. On October 27, 2023, Defendant Albence responded, reiterating DDOE's position that the *Higgin III* decision "does not impact the ability of eligible voters who are incarcerated in Delaware prison facilities to vote by absentee ballot." Ex. 3. Neither DDOC nor DDOE have provided legal authority or support for this position.

On November 29, 2023, the undersigned counsel, on behalf of Plaintiff, met with DDOC and DDOE to discuss possible remedies for the constitutional deprivation eligible incarcerated voters would suffer in the 2024 election absent intervention ("November 29 Meeting"). DDOC and DDOE provided no legal authority for their position that eligible incarcerated voters could vote absentee, relying instead on their past practice by referencing a standalone absentee ballot form (pre-existing *Higgin* altogether) that eligible incarcerated voters could use to vote absentee. DDOE said it had not conducted any official studies considering the cost of in-person machine voting as opposed to overseeing absentee voting in DDOC facilities. In fact, neither DDOC nor DDOE could identify anything specific done after *Higgin III* to study the possibility of in-person machine voting in facilities—despite the ACLU of Delaware's multiple demands in 2022 noting that the situation for incarcerated voters ahead of the 2024 elections was untenable. DDOE also indicated at this meeting that it was unaware of any limit on how many ballots an individual voter could challenge under Delaware's law permitting voter challenges. *See* 15 Del. C. § 5513. Thus, even if eligible incarcerated voters were not prosecuted for casting an absentee ballot post-*Higgin*

*III*, they risk having any such absentee ballots challenged and invalidated under § 5513, which would result in disenfranchisement.

The State's failure to provide a constitutional mechanism for eligible incarcerated voters to vote forecloses a substantial population of citizens from participating in the democratic process. People incarcerated for misdemeanors and held in pretrial detention constituted 38% of the entire DDOC Level V population, according to DDOC's 2022 Annual Report. *See* Ex. 9 at 20 (These facilities "house both sentenced inmates, and offenders held in detention awaiting trial, hearing, or sentencing."). As of October 12, 2023, DDOC was incarcerating 1,289 people on pretrial detention alone. Ex. 10 ¶ 12.

As for pretrial detention, Delaware has a bail system in which "bail" refers to "the amount of money a defendant must post to be released from custody until their trial is heard." Ex. 11. One form of bail is "cash only" bail, where "[t]he defendant, or someone on his/her behalf, must pay the Court a designated amount of money in order to be released." *Id.* Another form of bail is "secured bail," where "[t]he defendant must pay the Court a designated amount of money or post security in the amount of the bail in order to be released. This security can be in the form of cash or property . . . ." *Id.* More than 83% of individuals charged with crimes enumerated under the recent bail reform law, Senate Bill 7, face either cash only bail or secured bail, both of which condition pretrial release on some form of payment. Ex. 12 at 4. Pretrial detention is known to disproportionately impact Black and Hispanic Americans both nationally and in Delaware. *See* Ex. 13 at 2 (finding that nationally, young Black men are 50% more likely to be detained pre-trial than white defendants and Black and brown defendants receive bail amounts that are twice as high as bail set for white defendants). While only 23.8% of Delawareans are Black, (*see* Ex. 14), Black people made up more than 60% of all Delawareans incarcerated while awaiting criminal trial as of

6

October 12, 2023. Ex. 10 ¶ 12. In Delaware, Black people charged with crimes enumerated under Senate Bill 7 are more likely to be required to post cash bail than white defendants. Ex. 12 at 6.

For the 2024 general election, the early voting period begins on October 25, 2024, and Election Day is November 3, 2024. Ex. 15 at 11-12. This means that the entire voting period for the 2024 general election in Delaware is ten days—nine days of early voting and Election Day. According to its Annual Report, DDOC indicates that "detentioners" (persons incarcerated while awaiting trial) spend, on average, roughly 1.3 months in detention, whereas "jail inmates" (persons serving time for a misdemeanor conviction) face detention periods of more than three months on average. Ex. 9 at 21. Therefore, a substantial number of eligible voters—many of whom have not been convicted of a crime—will be disenfranchised during the entire 2024 general election voting period, as they will be incarcerated without a constitutional mechanism to cast their votes.

## ARGUMENT

When assessing a motion for preliminary relief, the Court must evaluate four factors: "(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *United States v. Bell*, 414 F.3d 474, 478 n.4 (3d Cir. 2005). Movants are "not required to prove [their] case in full at a preliminary-injunction hearing," even though they bear the burden of demonstrating that such relief is warranted. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## I.   PLAINTIFF HAS A REASONABLE PROBABILITY OF SUCCESS ON THE MERITS.

### A.   Plaintiff has a reasonable probability of success on its right-to-vote claim.

"[V]oting is of the most fundamental significance under our constitutional structure." *Ill.*

7

*Bd. of Elec. v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). As Defendants acknowledge, *see* Exs. 1-3, the fundamental right to vote applies with equal force to all eligible voters, including eligible incarcerated voters, *see O'Brien v. Skinner*, 414 U.S. 524, 528-30 (1974) (noting eligible incarcerated voters are "under no legal disability impeding their legal right to register or to vote"). This includes both pretrial detainees, who are legally innocent, and those convicted of misdemeanors, which are not disqualifying under Delaware law.

In assessing right-to-vote claims under federal law, courts apply the *Anderson-Burdick* sliding-scale balancing test, which requires that the reviewing court "first consider the character and magnitude of the asserted injury" to plaintiffs' constitutional rights," and weigh them against the "precise interests put forward by the State as justifications for the burden imposed by its rule." *Const. Party of Pa. v. Cortes*, 877 F.3d 480, 484 (3d Cir. 2017) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)); *see also Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Laws that "impose a severe burden" on the right to vote "trigger strict scrutiny under *Anderson-Burdick*." *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 146 n.38 (3d Cir. 2022), *cert. denied*, 2023 WL 7377826 (U.S. Oct. 2, 2023).

Strict scrutiny applies under *Anderson-Burdick* to Plaintiff's federal right-to-vote claim. Eligible incarcerated voters cannot vote in-person as Delaware does not provide a machine voting option in its prisons. Now, after *Higgin III*, eligible incarcerated voters can no longer lawfully vote absentee because Art. V. § 4A of the Delaware Constitution does not include incarceration as a permitted category for absentee balloting. *See Higgin III*, 295 A.3d at 1092 ("[T]he categories of voters identified in Section 4A constitute a comprehensive list of eligible absentee voters."). There is no third way to vote in Delaware. As such, the State's approach constitutes *total*

8

disenfranchisement and is a *per se* severe burden under *Anderson-Burdick. See Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) (holding the right to vote cannot "be denied outright."); *Mays v. LaRose*, 951 F.3d 775, 786 (6th Cir. 2020) ("[s]trict scrutiny is the standard for cases where 'the State totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote'") (quoting *Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973)); *Montgomery v. Whidbee*, 446 F. Supp. 3d 306, 312 (M.D. Tenn. 2020) ("the State cannot impose an 'absolute bar to voting' upon pretrial detainees otherwise entitled to vote without running afoul of the Equal Protection Clause of the Fourteenth Amendment") (citing *O'Brien* 414 U.S. at 529-30). Indeed, courts can find that laws that impose a less significant burden than total disenfranchisement constitute a severe burden under *Anderson-Burdick. See, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1211 (N.D. Ga. 2022) (finding challenged program creates a severe burden because affected voters must "navigate administrative obstacles that are distinctly more burdensome" than those examined in other courts); *see generally Crawford v. Marion Cnty.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring) ("Burdens are severe if they go beyond the merely inconvenient.").

In assessing voters' burden, "[t]he right to vote is personal and is not defeated [even if] 99% of other people can secure the necessary credentials easily." *Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016). Under *Anderson-Burdick*, then, courts must consider "not only a given law's impact on the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe." *Pub. Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016) (*en banc*); *see also Crawford*, 553 U.S. at 198, 201 (controlling op.) ("The burdens that are relevant to the issue before us are those imposed on persons who are eligible to vote but do not possess a [photo ID]."). In this way, it is the burden on Delaware's

eligible incarcerated voters—not the general population—that is critical for the *Anderson-Burdick* analysis. *See Ohio State Conf. of NAACP v. Husted* ("*Ohio NAACP*"), 768 F.3d 524, 545 (6th Cir.), *vacated on other grounds*, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) (noting burden disproportionately impacted Black voters likely to use voting opportunities at issue).

　　As noted above, Defendants' own data reflect that Delaware prisons are housing nearly 1,300 legally innocent people awaiting their trials and that the average stint for these voters is 1.3 months, which is longer than the full voting period for the November 2024 election. *See* Factual Background. Thus, it follows that, even crediting Defendants' own data, many hundreds of legally innocent voters incarcerated prior to their trials and housed in Delaware facilities during the November 2024 election voting period are fully barred from voting. Defendants' count of 1,300 voters does not include any of the additional voters with misdemeanor convictions living in Delaware prisons, who have a longer average stint in prisons than pretrial detainees. All these eligible incarcerated voters are barred from voting under Delaware law. Total disenfranchisement for *just one* eligible Delaware voter would constitute a severe and unconstitutional burden. The current situation, in which at least hundreds of Delaware voters are totally disenfranchised, is not merely a severe burden; it is a critical failure of democracy.

　　In appended letters, Defendants have voiced their view that *Higgin III* "does not impact the ability of eligible voters who are incarcerated in Delaware prison facilities to vote by absentee ballot," asserting that incarcerated voters "fall under the broader 'Business or Occupation' reason set forth in Article V, Section 4A." Exs. 1, 3-5. Yet Defendants do not have discretion to determine this; they are constrained to follow *Higgin III* because they cannot "exceed[] [their] authority by violating [their] directive to comply with the State's laws," *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 661 n.157 (Del. 2017). Here, the State's law under *Higgin III* is clear: "[T]he

categories of voters identified in Section 4A constitute a comprehensive list of eligible absentee voters." *Higgin III*, 295 A.3d at 1092; *see also id.* (finding a prohibition on "either abridging or *enlarging* those categories except by constitutional amendment") (emphasis added).

Regardless, even if Defendants' unsupported position were credited, it fails to address the chilling effect the current situation has on Plaintiff's members. Eligible incarcerated voters cannot be expected to risk violating state law by controverting the plain language of a Delaware Supreme Court holding and thus subjecting themselves to the risk of a felony criminal prosecution for voter fraud. By itself, this is facially unreasonable and constitutes a severe burden on the right to vote. Thus, even if these citizens were somehow still eligible to vote absentee—notwithstanding the plain language and clear reasoning of *Higgin III*—"some genuinely eligible voters may choose to forgo voting rather than risk prosecution" in light of this uncertainty. *Jones v. DeSantis*, 410 F. Supp. 3d 1284, 1307 (N.D. Fla. 2019), *aff'd*, 950 F.3d 795 (11th Cir. 2020). Simply put, Defendants' word is not enough to provide sufficient assurance to voters after *Higgin III*.

The fear of felony prosecution is no idle concern: Delaware law appears to affirmatively *require* prosecution of election offenses found in Chapter 51 Title 15 of the Delaware Code. *See generally Reylek v. Albence*, No. K22M-07-010 NEP, 2023 WL 4633411, at *5 (Del. Super. Ct. July 19, 2023) (suggesting that the Attorney General can be compelled to bring criminal prosecutions under certain circumstances). It is well-known and widely publicized (Ex. 16), that other states are regularly prosecuting voters for trying to vote, even when those voters have made good-faith mistakes as to their voting eligibility due to confusion about rights restoration procedures under state law, including: Florida, (*id.*); Texas, (Ex. 17 at 13) (discussing prosecution of Texas resident sentenced to five years in prison for attempting to vote while ineligible, despite her lack of knowledge); Tennessee, (*id.*) (discussing prosecution of Black Lives Matter activist

11

sentenced to six years in prison for illegally registering to vote despite her lack of knowledge); North Carolina, (Ex. 18); Minnesota, (Ex. 19) (describing prosecution of returning citizen who did not know her voting rights were not fully restored); and Georgia (Ex. 20). In Florida, for example, elections officials have stated that they have received an unprecedented number of *eligible* voters calling them "concerned that they may be prosecuted . . . for voter fraud." Ex. 21.

The chilling effect of DDOE's policy extends beyond the fear of potential prosecution. Eligible incarcerated voters who vote absentee risk their votes being challenged and invalidated under Delaware law. As DDOE acknowledges, Delaware law does not limit the number of voter challenges that a single citizen can bring. *See* Factual Background. In light of *Higgin III*, it is likely that any absentee ballots cast by eligible incarcerated voters could be challenged under Delaware statute, even in a mass challenge to hundreds or thousands of ballots—meaning that those voters, if not prosecuted, still risk having their ballots challenged and thrown out, resulting in disenfranchisement.[3] *See generally Higgin III*, 295 A.3d. at 1097 (contemplating State interest in challenges to voter qualifications ahead of Election Day).

Delaware's policy thus imposes a severe burden on the right of these incarcerated persons to vote. Yet even if eligible incarcerated voters did not face a severe burden, *Anderson-Burdick* requires a "means-end fit framework" and not merely "a rational basis test." Defendants are required to set forth more than "mere[] speculative concern[s]" to justify restrictions on voting rights. *Soltysik v. Padilla*, 910 F.3d 438, 449 (9th Cir. 2018). Even a "minimal" burden under *Anderson-Burdick* "must be justified by relevant and legitimate state interests 'sufficiently weighty

---

[3] *See, e.g.*, *Ickes v. Whitmer*, No. 1:22-cv-817, 2022 WL 4103030 (W.D. Mich. Sept. 8, 2022) (plaintiffs claimed their rights were violated because their votes were diluted because of "fraudulent votes."); *Bost v. Ill. State Bd. of Elections*, No. 22-cv-02754, 2023 WL 4817073 (N.D. Ill. Jul. 26, 2023) (same); *Election Integrity Project Cal. v. Weber*, Case No. 2:21-cv-00032-AB-MAA, 2023 WL 5357722 (C.D. Cal. Jul. 18, 2023) (same).

to justify the limitation.'" *Ohio NAACP*, 768 F.3d at 538 (quoting *Crawford*, 553 U.S. at 191). Regardless of the burden, Defendants must "articulate specific, rather than abstract state interests, and explain why the particular restriction imposed is actually necessary, meaning it actually addresses the interest put forth." *Id.* at 545. Defendants cannot satisfy even the lowest level of scrutiny under *Anderson-Burdick* because the State, as it admits, has no interest in completely disenfranchising an entire class of eligible voters. Indeed, the State has acknowledged the importance of ensuring that incarcerated eligible voters are "able to exercise their right to vote." Ex. 3. The State cannot claim any interest in avoiding administrative burden associated with in-person machine voting, given that Defendants have already admitted that they have not studied the possibility of in-person machine voting in DDOC facilities, including whether that system would cost more or less than their current absentee ballot system. *See infra*. Yet, even if they had, any administrative burden Defendants may claim cannot outweigh the mass denial of a fundamental right. *Id.*

**B.      Plaintiff has a reasonable probability of success on its Equal Protection claim.**

Plaintiff separately has a reasonable probability of success on its Equal Protection claim because Delaware law currently creates two classes of similarly situated voters: people awaiting criminal trial on release and who thus can vote, and people who are incarcerated while awaiting trial and who thus cannot vote.

The Equal Protection Clause guarantees qualified voters a right to participate equally with other qualified voters in the electoral process. *See Reynolds v. Sims*, 377 U.S. 533, 565-66 (1964) ("[T]he Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of state legislators."). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *see also Harper v. Va. Bd. of Elections*, 383 U.S. 663,

13

665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.").

The Supreme Court's decision in *O'Brien v. Skinner* is dispositive here. 414 U.S. at 528-30. In *O'Brien*, as here, the state in question (New York, in *O'Brien*) did not offer eligible voters in county jails—pretrial detainees and people incarcerated for misdemeanor offenses—polling places in the facilities or an opportunity to temporarily leave those facilities to vote in-person. *Id.* at 525. In *O'Brien*, as here, state law listed an "occupation or business" excuse for absentee voting but did not enumerate an "incarceration" excuse, leaving incarcerated voters unable to vote absentee under that excuse. *Id.* at 524-26. And in *O'Brien*, as here, state law left no doubt that these people were eligible voters. *Id.* at 525, 528. Pursuant to a separate provision of New York law at the time, however, an eligible voter could vote absentee if she was confined in a jail located outside the county in which that voter resided. *Id.* at 528-29. In other words, incarcerated eligible voters who were held in jails outside their county could vote, while those held in jails within their own county could not vote. The Court noted that, under this scheme, "two citizens awaiting trial— or even awaiting a decision whether they are to be charged … may receive different treatment as to voting rights." *Id.* at 529. The Court held that this violated the Equal Protection Clause because New York law "discriminate[d] between categories of qualified voters in a way that, as applied to pretrial detainees and misdemeanants, is wholly arbitrary." *Id.* at 530.

Delaware's scheme here is similarly "wholly arbitrary." Under the current law, post-*Higgin III*, an individual awaiting trial on release is able to vote. Yet an individual awaiting trial for the same or similar crime who is being held in a Delaware prison is unable to vote. Both individuals are eligible voters, both are being charged with the same or similar criminal offense, and neither

has been convicted of any crime. There is no constitutionally permissible justification for treating these two voters differently. Yet that is what Delaware law currently does.

Worse yet, Delaware's current scheme amounts to a *de facto* and unconstitutional wealth classification. Delaware has a bail system in which defendants are often required to post monetary bail to be released from custody prior to their trial. Ex. 11; Ex. 22. A recent analysis of pretrial detention in Delaware shows that more than 83% of individuals charged with crimes enumerated under the recent bail reform law, Senate Bill 7, face some amount of monetary bail. Ex. 12 at 4, 6. (This bail system disproportionately ensures that Black people are incarcerated as compared to White defendants.) As such, for many pretrial detainees, whether or not they reside inside or outside DDOC facilities ahead of trial—and therefore whether or not they are eligible to vote under the current status quo during that time—depends on their ability to pay.

Supreme Court precedent is clear: "[A] State violates the Equal Protection Clause … whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Harper*, 383 U.S. at 666; *see also id.* at 668 ("Wealth … is not germane to one's ability to participate intelligently in the electoral process."); *M.L.B. v. S.L.J.*, 519 U.S. 102, 124 (1996) (holding heightened scrutiny applies to Equal Protection claim because "[t]he basic right to participate in political processes as voters and candidates cannot be limited to those who can pay for a license"); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1216 n.1 (11th Cir. 2005) (en banc) ("Access to the franchise cannot be made to depend on an individual's financial resources."); *see also generally Griffin v. Illinois*, 351 U.S. 12, 18 (1956) (holding once a government choose to grant a right, it cannot do so "in a way that discriminates against some [people] on account of their poverty."). In *Crawford*, the Supreme Court upheld a voter identification provision in Indiana only because the photo ID cards the state issued were free for voters; the Court found that the statute

would have failed constitutional muster under *Harper* "if the State required voters to pay a tax or a fee to obtain a new photo identification." *Crawford*, 553 U.S. at 198; *see also Brakebill v. Jaeger*, 932 F.3d 671, 689 (8th Cir. 2019) (similar).

Delaware law currently provides that an individual awaiting trial who can afford bail and is thus released has the ability to vote, but a similarly situated individual awaiting trial for the same crime who cannot afford bail cannot vote. Making pretrial detainees' ability to vote dependent on their ability to pay bail is the definition of an arbitrary, irrational, and unconstitutional classification under the Equal Protection Clause.

## II.   PLAINTIFF WILL SUFFER IRREPARABLE INJURY IF THIS COURT DOES NOT PROVIDE INJUNCTIVE RELIEF.

When voting rights "are threatened or impaired, irreparable injury is presumed." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury"); *see also id.* ("[O]nce the election occurs, there can be no do-over and no redress."); *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. CV 81-03876, 2016 WL 6584915, at *17 (D.N.J. Nov. 5, 2016) ("[C]ourts have consistently found that a 'person who is denied the right to vote suffers irreparable injury'" because "infringement on the right to vote 'cannot be alleviated after the election.'") (quoting *Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997); *United States v. Berks Cnty., Pa.*, 277 F. Supp. 2d 570, 578 (E.D. Pa. 2003) ("Denial of the right to participate in an election is by its nature an irreparable injury."). Also, fear of prosecution—which eligible incarcerated voters would have to face in order to vote—also constitutes irreparable harm. *ACLU v. Reno*, 31 F. Supp. 2d 473, 497 (E.D. Pa. 1999) ("[F]ac[ing] criminal prosecution and penalties" for exercise of constitutional rights "constitutes irreparable harm.").

16

Here, without injunctive relief, Plaintiff's eligible incarcerated voter members will remain completely disenfranchised, including for and up through the November 2024 general election. This deprivation of the fundamental right to vote constitutes *per se* irreparable harm.

## III.   THE BALANCE OF HARDSHIPS FAVORS PLAINTIFF.

The balance of hardships favors Plaintiff because, for reasons discussed *supra*, Plaintiff and its members "will likely suffer an irreparable loss of their constitutional rights" absent an injunction. *Gilliam v. Foster*, 63 F.3d 287, 292 (4th Cir. 1995); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("[T]he balance of the equities favor prevent[ing] the violation of a party's constitutional rights") (internal quotes and citation omitted).

By contrast, any potential harm to Defendants is speculative, minimal and cannot compare to the harm of deprivation of constitutional rights. *See generally Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (affirming district court finding that "a potential deprivation of [plaintiff's] constitutional right" outflanked State's interests even when the court determined the latter were legitimate). As a preliminary matter, administrative burdens cannot overcome and oust constitutional rights. *See, e.g.*, *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016) ("There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by [the Secretary of State's] office and other state and local offices involved in elections."); *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1254 (D. Utah 2017) ("Reducing administrative burdens is … not a sufficient state interest to outweigh Plaintiffs' First and Fourteenth Amendment rights."); *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (finding that administrative, time, and financial burdens are "minor when balanced against the right to vote, a right that is essential to an effective democracy").

Further, any administrative burden Defendants claim is speculative. Defendants have already admitted they have not studied this issue, nor conducted any studies to determine whether providing in-person machine voting in DDOC facilities is costlier than the current system. *See* Factual Background. Defendants cannot credibly plead administrative burden without this evidence. Regardless, Plaintiff's remedy is not unduly burdensome. Jurisdictions in at least four other states, and the District of Columbia, have implemented jail-based polling locations at reasonable cost. Ex. 8. *See also generally McDonald v. Bd. of Elec. Comm'rs of Chicago*, 394 U.S. 802, 808 n.6 (1969) (contemplating that a state may "possibly furnish the jails with special polling booths or facilities on election day"). These states' successful experiences prove the logistical and fiscal feasibility of jail-based polling locations and offer Delaware a roadmap for how to successfully implement such a solution if so ordered. Ex. 8.[4] Delaware has only four Level V Prisons (*see* Ex. 9 at 10) and recently invested $13 million in "a fleet of new voting machines," which the State has said "provide[s] the first, verifiable paper trail of Delaware voters' ballots in decades and allow[s] for a full audit of election results." Ex. 23. And Defendants will have more time to implement this remedy than Delaware had to implement the remedy ordered in *Higgin II*, which imposed far more foundational changes to Delaware's election system—the invalidation of same-day voter registration *and* the vote-by-mail statute—just three weeks out from the 2022 election. *See Higgin II*, 2022 WL 5333790.

---

[4] In Cook County, Illinois, for example, more than 2,000 individuals in the jail—about 37% of the jail's population—voted in the 2020 general election in the jail's first in-person voting experience. Ex. 8 at 1-2. About 25% of the people incarcerated while awaiting trial at the jail voted in the June 2022 primary, compared to less than 7% who voted during the 2018 primary election when only absentee voting was available. *Id*.

## IV.    A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST.

Finally, a preliminary injunction will serve the public interest. "By definition, 'the public interest … favors permitting as many qualified voters to vote as possible." *League of Women Voters of N.C.*, 769 F.3d at 247-48; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (same). An injunction here will preserve the fundamental right to vote for eligible incarcerated voters, which is in the public interest. An injunction that increases voter access for eligible incarcerated voters in particular serves the public interest because "[s]cience supports the right to vote as part of a package of prosocial behaviors and links voting to increased public safety." Ex. 24.

Further, "the public has an interest in ensuring federal laws are followed, particularly when those interests relate to voting rights." *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1006 (W.D. Mo. 2018). By contrast, "[t]he public has no interest in enforcing unconstitutional laws." *Firearms Policy Coal. Second Amend. Def. Comm. v. Harris*, 192 F. Supp. 3d 1120, 1129 (E.D. Cal. 2016). The public's interest in compliance with the Constitution regarding the fundamental right to vote also weighs strongly in favor of preliminary relief here.

## <u>CONCLUSION</u>

Plaintiff respectfully requests this Court grant its motion for a preliminary injunction.

Respectfully submitted,

*/s/ Emily S. DiBenedetto*
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Plaintiff*

        *-and-*

OF COUNSEL:
Jonathan Topaz
Casey Smith
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
  FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 249-2500

Stephen D. Hibbard
Aaron M. Francis
Seth H. Victor
Dixie M. Morrison
PROSKAUER ROSE LLP
2029 Century Park E. #2400
Los Angeles, CA 90067
(310) 284-5600

Michael J. Lebowich
Godfre O. Blackman
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000

Dwayne Bensing (No. 6754)
AMERICAN CIVIL LIBERTIES UNION
  OF DELAWARE
100 W. 10 Street, Suite 706
Wilmington DE 19801
(302) 295-2113
dbensing@aclu-de.org

Dated: December 15, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2023, this document was served on the persons listed

below in the manner indicated:

**BY HAND DELIVERY**

The Honorable Anthony J. Albence
State of Delaware - Department of Elections
905 S. Governors Avenue, Suite 170
Dover, DE 19904

The Honorable John Carney
Governor Executive Office
Tatnall Building
150 Martin Luther King Jr. Blvd.
Dover, DE  19901

The Honorable Terra Taylor
Delaware Department of Correction
Office of the Commissioner
245 McKee Road
Dover, DE 19904

*/s/ Emily S. DiBenedetto*
Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Plaintiff*

-and-

Dwayne Bensing (No. 6754)
AMERICAN CIVIL LIBERTIES UNION
 OF DELAWARE
100 W. 10 Street, Suite 706
Wilmington DE 19801
(302) 295-2113
dbensing@aclu-de.org

21