IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PRISONERS LEGAL ADVOCACY NETWORK, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 23-1397-JLH |
| THE HONORABLE JOHN CARNEY, in his official capacity as Governor of the State of Delaware, THE HONORABLE ANTHONY J. ALBENCE, in his official capacity as State Election Commissioner of the Delaware Department of Elections, and, THE HONORABLE TERRA TAYLOR, in her official capacity as Acting Commissioner of the Delaware Department of Correction, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**SUPPLEMENTAL BRIEF ADDRESSING PLAINTIFF'S STANDING
AND CERTIFICATION TO THE DELAWARE SUPREME COURT**


OF COUNSEL:
Jonathan Topaz
Casey Smith
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 249-2500

Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com

*-and-*

Stephen D. Hibbard
Aaron M. Francis
Seth H. Victor
Dixie M. Morrison
PROSKAUER ROSE LLP
2029 Century Park E. #2400
Los Angeles, CA 90067
(310) 284-5600

Michael J. Lebowich
Godfre O. Blackman
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000

Dated: June 20, 2024

Dwayne J. Bensing (No. 6754)
Andrew Bernstein (No.7161)
AMERICAN CIVIL LIBERTIES UNION
 OF DELAWARE
100 W. 10 Street, Suite 706
Wilmington DE 19801
(302) 295-2113
dbensing@aclu-de.org
abernstein@aclu-de.org

*Attorneys for Plaintiff*

1

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................1

I.    PLAN AND ITS MEMBERS HAVE SUFFERED CONCRETE INJURIES THAT ARE TRACEABLE TO DEFENDANTS' CONDUCT AND REDRESSABLE BY THIS COURT ..............................................................................................................1

    A.    PLAN and its Members Have Suffered Concrete Injuries Sufficient for Article III ........................................................................................................1

        1.    PLAN's Diversion of Resources Resulting From Defendants' Inaction Constitutes a Concrete Injury Under Organizational Standing ...................2

        2.    The Concrete Injuries Suffered by PLAN's Members Resulting From Defenedants' Conduct Are Sufficient to Confer PLAN Associational Standing ................................................................................................4

            i.    PLAN's Prison Paralegals and Jailhouse Lawyers Are No Longer Able to Discharge Their Core Responsibilites as a Result of Defendants' Conduct ................................................................4

            ii.    PLAN Will Have Constituents in the 2024 General Election Voting Period Who Face Potential Voter Challenges Resulting in Disenfranchisement ..................................................................5

                a.    Defendants' Representation That They Will Not Pursue Voter Prosecutions Is Immaterial to the Standing Analysis .....................................................................................8

                b.    PLAN Need Not Identify by Name its Members Who Have Suffered or Will Suffer Injury as a Result of Defendants' Conduct .....................................................10

    B.    PLAN's Concrete Injuries Are Traceable to Defendants' Conduct ......................11

    C.    The Requested Relief Is Likely to Redress PLAN's Injuries ...............................13

II.    THERE IS NO QUESTION OF STATE LAW TO CERTIFY TO THE DELAWARE SUPREME COURT ..........................................................................................................14

    A.    Legal Standard .......................................................................................................15

    B.    Delaware State Law is Clear ...................................................................................16

i

C.      Certification Would Unnecessarily Exhaust Judicial Resources and Harm
        Plaintiff and its Members ...................................................................................... 17

CONCLUSION ...................................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023).................................................................6, 7

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  41 F.4th 586 (D.C. Cir. 2022).................................................10

*Albence v. Higgin*,
  295 A.3d 1065 (Del. 2022) ............................................... *passim*

*Alexander v. Riga*,
  208 F.3d 419 (3d Cir. 2000).....................................................2

*Baker v. Croda Inc.*,
  2022 WL 19010312 (3d Cir. Oct. 21, 2022).........................16

*Camreta v. Greene*,
  563 U.S. 692 (2011)...................................................................4

*Christy v. Pa. Turnpike Comm'n*,
  54 F.3d 1140 (3d Cir. 1995).....................................................19

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983).....................................................................7

*Clemens v. ExecuPharm Inc.*,
  48 F.4th 146 (3d Cir. 2022) .....................................................11

*Common Cause Ind. v. Lawson*,
  937 F.3d 944 (7th Cir. 2019) ...................................................3

*Common Cause of Pa. v. Pennsylvania*,
  558 F.3d 249 (3d Cir. 2009)......................................................2

*Const. Party of Pa. v. Aichele*,
  757 F.3d 347 (3d Cir. 2014)......................................................13

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)...................................................................8

*Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*,
  141 F.3d 71 (3d Cir. 1998)........................................................2

iii

*Fair Hous. Rights Ctr. in Se. Pa. v. Post Goldtex GP, LLC*,
    823 F.3d 209 (3d Cir. 2016)..................................................................................2

*FEC v. Cruz*,
    596 U.S. 289 (2022)......................................................................................9, 12

*Fiat Motors of N. Am., Inc. v. Mayor & Council of City of Wilmington*,
    619 F. Supp. 29 (D. Del.), *certified question answered*, 498 A.2d 1062 (Del.
    1985) ...........................................................................................................19

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    Nos. 23–235 and 23–236, 2024 WL 2964140 (U.S. June 13, 2024)........................4

*Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*,
    832 F.3d 469 (3d Cir. 2016)................................................................................13

*Gutierrez v. Johnson & Johnson*,
    523 F.3d 187 (3d Cir. 2008)................................................................................19

*Hassan v. City of New York*,
    804 F.3d 277 (3d Cir. 2015)..........................................................................12, 13

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)........................................................................................2, 3

*Hosp. Council of W. Pa. v. City of Pittsburgh*,
    949 F.2d 83 (3d Cir. 1991)........................................................................4, 6, 13

*Hotel & Rest. Emps. Union, Loc. 25 v. Smith*,
    846 F.2d 1499 (D.C. Cir. 1988).........................................................................10

*Howard v. N.J. Dep't of Civil Serv.*,
    667 F.2d 1099 (3d Cir. 1981)...............................................................................6

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)............................................................................................4

*In re Abbott*,
    308 A.3d 1139 (Del. 2023), *cert. denied*, No. 23-855, 2024 WL 2805749
    (U.S. June 3, 2024) .............................................................................................5

*Kiser v. Reitz*,
    765 F.3d 601 (6th Cir. 2014) ...............................................................................5

*Lehman Bros. v. Schein*,
    416 U.S. 386 (1974)...........................................................................................15

*Lozano v. City of Hazleton*,
  620 F.3d 170 (3d Cir. 2010), *vacated on other grounds*, 563 U.S. 1030 (2011)................7, 10

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).............................................................................................1, 11

*Massachusetts v. E.P.A.*,
  549 U.S. 497 (2007)..................................................................................................11

*Mielo v. Steak 'n Shake Operations, Inc.*,
  897 F.3d 467 (3d Cir. 2018)......................................................................................13

*N.J. Bankers Ass'n v. Att'y Gen. N.J.*,
  49 F.4th 849 (3d Cir. 2022).......................................................................................13

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
  508 U.S. 656 (1993)..................................................................................................13

*Newark Branch, N.A.A.C.P. v. City of Clifton*,
  1990 U.S. Dist. LEXIS 17512 (D.N.J. Dec. 27, 1990)..........................................10

*Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*,
  907 F.2d 1408 (3d Cir. 1990)......................................................................................6

*O'Brien v. Skinner*,
  414 U.S. 524 (1974)..................................................................................................17

*Oncale v. Sundowner Offshore Servs., Inc.*,
  523 U.S. 75 (1998)....................................................................................................14

*Opinion of the Justices*,
  295 A.2d 718 (Del. 1972)....................................................................................16, 19

*Pa. Prison Soc'y v. Cortes*,
  508 F.3d 156 (3d Cir. 2007)........................................................................................7

*Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*,
  913 F.2d 64 (3d Cir. 1990)..........................................................................................4

*Pustell v. Lynn Pub. Schs.*,
  18 F.3d 50 (1st Cir. 1994)...........................................................................................9

*Remington Arms Co. v. Liberty Mut. Ins. Co.*,
  796 F. Supp. 117 (D. Del. 1992)......................................................................17, 19, 20

*Roe v. Operation Rescue*,
  919 F.2d 857 (3d Cir. 1990)........................................................................................6

*Speech First, Inc. v. Shrum,*
   92 F.4th 947 (10th Cir. 2024) ...................................................................10

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014)...............................................................................6, 9

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (June 25, 2021) ...................................................................7

*United States v. Defreitas,*
   29 F.4th 135 (3d Cir. 2022) ........................................................15, 16, 19

*Vote.Org v. Callanen,*
   89 F.4th 459 (5th Cir. 2023) .....................................................................3

*Warth v. Seldin,*
   422 U.S. 490 (1975)..................................................................................9

*Wersal v. Sexton,*
   613 F.3d 821 (8th Cir. 2010) ...................................................................19

## STATUTES, RULES & CONSTITUTIONS

10 Del. C. § 141(a)......................................................................................19

15 Del. C. § 4936-37......................................................................................9

15 Del. C. § 5510............................................................................................9

52 U.S.C. § 10307(c) ......................................................................................9

Del. Sup. Ct. R. 41 ...................................................................................18, 20

Del. Const. art. 5, § 4A ...............................................................14, 16, 17, 19, 20

## INTRODUCTION

Plaintiff submits this brief in response to this Court's June 6, 2024 Order asking Plaintiff to show cause: "(1) why this case should not be dismissed for lack of subject matter jurisdiction, because Plaintiff lacks standing; and (2) if the Court does have jurisdiction, why it should not certify a question to the Delaware Supreme Court."  D.I. 28.  First, Plaintiff has satisfied both organizational and associational standing, because PLAN and its members already have suffered and continue to suffer ongoing injuries that satisfy Article III standing.  Second, this Court should not certify any question to the Delaware Supreme Court, because whether incarcerated voters are eligible to cast an absentee ballot is unambiguous under Delaware law and any certification risks delay that will disenfranchise eligible incarcerated voters for the upcoming November 2024 election.

## ARGUMENT

I.   **PLAN AND ITS MEMBERS HAVE SUFFERED CONCRETE INJURIES THAT ARE TRACEABLE TO DEFENDANTS' CONDUCT AND REDRESSABLE BY THIS COURT.**

A plaintiff pursuing a federal court action must establish (i) an "injury in fact"; (ii) a causal connection between the injury and the conduct complained of; and (iii) that the injury will be redressed by a favorable decision to satisfy the requirements of Article III.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  All three have been clearly satisfied.

   **A.   PLAN and its Members Have Suffered Concrete Injuries Sufficient for Article III Standing.**

PLAN satisfies Article III standing based on both organizational standing (*i.e*., where a plaintiff-organization seeks vindication of an injury on its own behalf) and associational standing (*i.e*., where a plaintiff-organization seeks vindication of its members' injuries on their behalf). *See Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 261 (3d Cir. 2009) (juxtaposing organizational vs. associational standing).

> **1** PLAN's Diversion of Resources Resulting From Defendants' Inaction Constitutes a Concrete Injury Under Organizational Standing.

A well-established principle of organizational standing is that impairment to an organization's mission constitutes a concrete injury, especially where the impairment is "perceptible." *See Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 76 (3d Cir. 1998) ("[w]here discriminatory practices have perceptibly impaired an organization's ability to carry out its mission, there can be no question that the organization has suffered injury in fact.") (cleaned up) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Fair Hous. Rights Ctr. in Se. Pa. v. Post Goldtex GP, LLC*, 823 F.3d 209, 214 n.5 (3d Cir. 2016).

A perceptible impairment exists, *inter alia*, where an organization is forced to divert its resources away from aims core to its organizational activities as a result of a defendant's conduct or inaction, harming its organizational mission. *See Havens*, 455 U.S. at 379 ("Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests[.]"); *Post Goldtex*, 823 F.3d at 214 n.5 (finding allegations that the organization's "mission to eradicate housing discrimination has been frustrated because it has had to divert resources in order to investigate and prosecute the alleged discriminatory practices in this case . . . . sufficient to establish standing") (citations omitted); *Alexander v. Riga*, 208 F.3d 419, 427 n.4

2

(3d Cir. 2000) (finding injury where the organization "diverted resources to investigate and to counter [defendants'] conduct.") (citations omitted).

In particular, "a voting law can injure an organization enough to give it standing by compelling it to devote resources to combatting the effects of that law that are harmful for the organization's mission."  *Common Cause Ind. v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) (cleaned up) (citation omitted); *see also Vote.Org v. Callanen*, 89 F.4th 459, 471 (5th Cir. 2023). Such is the case here.  PLAN's mission is "to defend and expand the legal rights of presently and formerly incarcerated individuals so that those who are directly impacted by the U.S. criminal legal system can live with dignity and without fear."  Compl. ¶ 8.  Defendants' inaction following *Albence v. Higgin,* 295 A.3d 1065 (Del. 2022) ("*Higgin III*") created confusion among eligible incarcerated voters and legal uncertainty for advocates advising these voters about their rights.  *Id*. ¶ 32; *see also* D.I. 26, Declaration of Paul Stanley Holdorf ("Holdorf Decl.") ¶ 6.  As a result, PLAN was forced to divert disproportionate resources to Delaware to, among other things: (i) revise legal questionnaires and investigate the experiences of incarcerated voters; (ii) revise presentations, materials, and trainings for staff; (iii) revise guidance for incarcerated voters; (iv) adapt legal resource materials for jailhouse lawyers and incarcerated voters; (v) invest in software to broaden accessibility to legal resource materials; (vi) expand publication of general voting rights resources; and (vii) increase the frequency of meetings.  *Id*. ¶¶ 6–10; Compl. ¶ 32.  These examples of diversion are unusually numerous, varied, detailed, and substantiated (through sworn declaration) at this early stage of the litigation, and remain wholly unrebutted.  Plaintiff has identified several concrete injuries to satisfy organizational standing.[1]

---

[1] PLAN is factually very similar to the organization asserting standing in *Havens Realty*—PLAN is "an issue-advocacy organization" whose core activities are "directly affected" by the challenged

**2** The Concrete Injuries Suffered by PLAN's Members Resulting From Defendants' Conduct Are Sufficient to Confer PLAN Associational Standing.

To assert associational standing, (i) a plaintiff-organization's members must have standing on their own; (ii) the interests the plaintiff-organization seeks to protect must be germane to its purpose; and (iii) neither the claim asserted nor the relief requested can require individual participation by the plaintiff-organization's members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977); *see also Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 70 (3d Cir. 1990).

The latter two elements are uncontested. As is clear from PLAN's mission, discussed *supra*, the interests PLAN seeks to protect are germane to its purpose. Moreover, "[t]he Supreme Court has repeatedly held that requests by an association for declaratory and injunctive relief do not require participation by individual association members." *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) (citations omitted). The other element (*i.e.*, that the members have standing on their own) is met here, because two distinct groups of PLAN members have suffered concrete injuries as a result of Defendants' inaction: PLAN's prison paralegal and jailhouse lawyer-members and PLAN's constituent-members.

         i. PLAN's Prison Paralegals and Jailhouse Lawyers Are No Longer Able to Discharge Their Core Responsibilities as a Result of Defendants' Conduct.

.

An individual's inability to continue to perform their job duties as they previously did is a sufficiently concrete injury for standing purposes. *See Camreta v. Greene*, 563 U.S. 692, 703 (2011) (finding that a public official has standing to challenge a ruling; "[i]f the official regularly

---

conduct. *Food & Drug Admin. v. All. for Hippocratic Med.*, Nos. 23–235 and 23–236, 2024 WL 2964140, at *13 (U.S. June 13, 2024). In this case, PLAN is a quintessential legal services organization whose injury and subsequent conduct satisfies organizational standing.

4

engages in that conduct as part of his job . . . he suffers injury caused by the adverse constitutional ruling," as "he must either change the way he performs his duties or risk a meritorious damages action").[2]  The Complaint and Holdorf Declaration both make clear that the work of PLAN's prison paralegals and jailhouse lawyers has radically changed; these members can no longer ethically assist eligible incarcerated voters with casting absentee ballots because of the massive legal upheaval caused by *Higgin III* and Defendants' inaction.[3]  Compl. ¶ 34; *see also* Holdorf Decl. ¶ 11.  Rather than helping incarcerated voters understand and exercise their voting rights, PLAN's prison paralegals and jailhouse voters are now forced to correct their previous messaging and caution incarcerated voters about the risks posed by voting absentee due to the confusion introduced by the State's inaction post-*Higgin III*.  Holdorf Decl. ¶¶ 11–12.  Accordingly, PLAN's prison paralegals and jailhouse lawyer-members' ongoing inability to effectively perform their duties as they were once able to do constitutes a concrete injury sufficient for Article III standing.  Defendants have not addressed the injury to PLAN's prison paralegals and jailhouse lawyers at all in their briefing.  *See* D.I. 25 at 4–5.

> ii. PLAN Will Have Constituents in the 2024 General Election Voting Period Who Face Potential Voter Challenges Resulting in Disenfranchisement.

Even a merely imminent (*i.e.*, threatened) injury may be concrete "where the threat is so great that it discourages the threatened party from . . . attempting to exercise his or her rights."

---

[2] *See also Kiser v. Reitz*, 765 F.3d 601, 608 (6th Cir. 2014) (finding that dentist was injured by regulation that prevented his "intended advertisement of his general dentistry and endodontic services").

[3] Indeed, PLAN's lawyer-members risk disbarment or other state bar discipline by advising their clients to act in ways apparently prohibited by a Delaware court; *see, e.g.*, *In re Abbott*, 308 A.3d 1139, 1151 (Del. 2023), *cert. denied*, No. 23-855, 2024 WL 2805749 (U.S. June 3, 2024) (disciplinary action whose "genesis . . . was advice [a lawyer] gave to his client to help the client violate an order and bench rulings issued by the Court of Chancery").

*Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.*, 907 F.2d 1408, 1414 (3d Cir. 1990) (quoting *Howard v. N.J. Dep't of Civil Serv.*, 667 F.2d 1099, 1103 (3d Cir. 1981)); *see also Hosp. Council of W. Pa.*, 949 F.2d at 87 (finding a complaint "alleged harm that was temporally concrete" where it alleged that the plaintiff-organization's members "were immediately in danger of sustaining injury"). Such "imminent" injuries are considered concrete for associational standing. *See, e.g.*, *Roe v. Operation Rescue*, 919 F.2d 857, 866 (3d Cir. 1990) (finding that plaintiff-organization "must show that these members have suffered some actual *or threatened* harm as a result of [defendant's] putatively illegal conduct") (emphasis added).

For example, in *Operation Rescue*, the plaintiff-organization represented members "who *in the future may* require the services offered at Philadelphia area [abortion] clinics" and "who *will* need to use abortion and family planning facilities in the area targeted by defendants." *Id.* (emphasis added). The court found these allegations sufficient to establish associational standing and permitted the plaintiff-organization to challenge the blocking of access to abortion clinics that its members would use in the future. *Id.* The court further noted that standing existed where there was only "a *real risk* that [the organization's] members *[would] be deprived of*" the then-constitutional right to abortion on account of the challenged actions. *Id.* at 866 n.6 (emphasis added); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (finding that plaintiff-organizations alleged injury where the challenged statute "allows 'any person' with knowledge of the purported [statutory] violation to file a complaint") (citation omitted).

More recently, in *303 Creative LLC v. Elenis*, the Supreme Court held that a website designer had standing to seek an injunction against Colorado based purely on a hypothetical threat of action. 600 U.S. 570 (2023). In that case, the plaintiff had a proposed website-design business that she had not yet launched out of concern that Colorado would force her to express views with

6

which she disagreed in compliance with state anti-discrimination laws. *Id.* at 580. The basis for the plaintiff's bid for standing was her "alleg[ation] that, if she enters the wedding website business . . . she faces a credible threat that Colorado will seek to use [the state anti-discrimination statute] to compel her to create websites celebrating marriages she does not endorse." *Id.* at 581 (citation omitted). PLAN's constituent-members' fears of voter challenges are more concrete than that suffered by the plaintiff in *303 Creative*. *See also Lozano v. City of Hazleton*, 620 F.3d 170, 191 (3d Cir. 2010), *vacated on other grounds*, 563 U.S. 1030 (2011) (rejecting defendant's argument that tenant-plaintiffs' "fears of eviction are merely conjectural because 'none of them have been evicted or have received any threat or warning that they might be evicted in the future.'") (citations omitted).

With the rising volume of voter challenges in recent years, Compl. ¶ 52, and Delaware law's permitting anyone to bring unlimited voter challenges, *id.* ¶ 28, the imminence of the injuries that PLAN's constituent-members will suffer cannot be dismissed as mere conjecture.[4] PLAN has (i) had incarcerated members in DDOC facilities at all times since 2017, (ii) current members in DDOC facilities who wish to vote in November, and (iii) current members who will be incarcerated for the entire voting period, Holdorf Decl. ¶¶ 14–16—meaning that PLAN's constituent-members are "likely to suffer future injury" as a result of the current post-*Higgin III* status quo. *Pa. Prison Soc'y v. Cortes*, 508 F.3d 156, 166 (3d Cir. 2007) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). Accordingly, PLAN's constituent-members also have suffered a concrete injury sufficient for Article III standing.

---

[4] Indeed, by "freely authoriz[ing] unharmed plaintiffs to" bring voter challenges, Delaware law takes discretionary decisions such as "how to prioritize and how aggressively to pursue legal actions against [voters] who violate the law" away from public officials and hands that discretion to ideologically motivated plaintiffs who "are not accountable to the people and are not charged with pursuing the public interest . . . ." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (June 25, 2021).

a. Defendants' Representation That They Will Not Pursue Voter Prosecutions Is Immaterial to the Standing Analysis.

The Supreme Court has rejected the argument that purportedly "unfounded fears" as to what the government will do breaks "the chain of causation" for purposes of standing. *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). In *Department of Commerce*, the Court considered state challenges to the Secretary of Commerce deciding to add a question about citizenship on the 2020 census. The states' asserted injury was that adding the citizenship question would, in the future, cause noncitizens to refrain from responding to the census, thus diminishing the federal funding and political representation of states with disproportionate noncitizen populations. The government argued that this potential future harm was too speculative, as the predicted refusal of noncitizens to respond to the census "would be motivated by unfounded fears that the Federal Government will itself break the law by using noncitizens' answers against them for law enforcement purposes." *Id*. at 767–68. The Supreme Court rejected this argument, finding that "[r]espondents' theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on *the predictable effect of Government action* on the decisions of third parties." *Id*. at 768 (emphasis added).

Here, even if one takes at face value Defendants' contentions that PLAN's clients' fears of prosecution or other legal action are unfounded, they are nonetheless a predictable effect of the *Higgin III* holding, just as in *Department of Commerce*, where it was predictable that noncitizens would have a disproportionately lower nonresponse rate even though there was a legal "requirement that the Government keep individual answers confidential." *Id.* At any rate, for standing purposes, the Court need not engage in "he-said she-said" credibility determinations

between two parties with different interpretations of whether the law prohibits certain conduct.[5]

"For standing purposes, [courts] accept as valid the merits of [claimants'] legal claims . . . ." *Cruz*,

596 U.S. at 298; *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends

on the merits of the plaintiff's contention that particular conduct is illegal . . . .").

Prosecution by the state is not the only potential harm facing PLAN members considering

whether to vote.  PLAN's constituency of incarcerated voters casting absentee ballots (in

contravention of *Higgin III*) may be subject to third-party actions that seek disqualification of their

ballots, *see* 15 Del. C. § 5510; 15 Del. C. § 4936-37.[6]  *See also Susan B. Anthony List*, 573 U.S. at

164 (finding that the "credibility" of a future threat of legal enforcement against planned action "is

bolstered by the fact that authority to file a complaint . . . is not limited to a prosecutor" and "there

is a real risk of complaints from, for example, political opponents"); *cf. Pustell v. Lynn Pub. Schs.*,

18 F.3d 50, 52 (1st Cir. 1994) ("Regardless of the imminence of an enforcement action" by the

defendant, plaintiffs "suffer the harm" of potential enforcement actions by other parties, such as

the state.).

Indeed, a lack of prior voter challenges and prosecutions in Delaware misses the point;

voters reasonably (and correctly) understand that newly passed laws or newly issued court

---

[5] Similarly, in *Federal Election Commission v. Cruz*, the U.S. Supreme Court faced conflicting arguments about the potential enforcement of Section 304 of the Bipartisan Campaign Reform Act against the appellees repaying campaign loans to Senator Ted Cruz.  The Court acknowledged that the parties' "arguments have an Alice in Wonderland air about them, with the Government arguing that appellees would *not* violate the statute by repaying Cruz, and the appellees arguing that they *would*," but nonetheless found that the appellees had standing.  596 U.S. 289, 299–300 (2022) (emphasis original).

[6] Moreover, If PLAN's lawyers were to advise PLAN constituents to vote *Higgin III* makes clear incarcerated voters cannot use absentee voting, PLAN's lawyers and staff advising and educating those voters could be subject to disciplinary action by the State bar or enforcement of other provisions of federal law, *see e.g.*, 52 U.S.C. § 10307(c) (prohibition against providing false information in connection with voter registration or ballot casting).

interpretations of laws (*i.e.*, *Higgin III*) may trigger state actions or voter challenges against them even though, by necessity, the State has not yet prosecuted an individual under that law or interpretation.

      b.  PLAN Need Not Identify by Name its Members Who Have Suffered or Will Suffer Injury as a Result of Defendants' Conduct.

As numerous federal courts have recognized, plaintiffs may fulfill Article III's standing requirements even on an anonymized basis. *See Lozano*, 620 F.3d at 192, 194 (finding that "Doe Plaintiffs" had Article III standing and prudential standing to challenge city ordinances); *Newark Branch, N.A.A.C.P. v. City of Clifton*, 1990 U.S. Dist. LEXIS 17512, at *42 (D.N.J. Dec. 27, 1990) (denying motion to dismiss complaint that did not name specific affected NAACP members because "the critical questions are whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer . . . a court cannot expect a complaint to . . . proffer all available evidence"); *see also, e.g.*, *Speech First, Inc. v. Shrum*, 92 F.4th 947, 949–50 (10th Cir. 2024) (finding that organization had standing to sue on behalf of its members even "when the organization's members on whom Speech First relies for standing are not identified by name"); *Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 593 (D.C. Cir. 2022) (rejecting argument that organization could not establish organizational standing "because no individual driver filed an affidavit, and so the Highway Advocates have failed to specifically identify members who have suffered the requisite harm") (cleaned up); *Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 846 F.2d 1499, 1506 (D.C. Cir. 1988) ("The anonymity of union member asylum applicants does not undermine those members' standing to bring this claim.  To satisfy itself that the requirements of 'injury in fact'

and causation have been met, the court need only know that some union members . . . were probably subjected to the" challenged procedures.).

**B. PLAN's Concrete Injuries Are Traceable to Defendants' Conduct.**

Defendants' injurious conduct in this case arises chiefly from a *failure* to act, which PLAN seeks to remedy through injunctive relief.  Courts have found that failures to act (as opposed to affirmative actions) can themselves constitute conduct sufficient to cause injury for standing purposes.  *See, e.g.*, *Massachusetts v. E.P.A.*, 549 U.S. 497, 523 (2007) (finding that the state of Massachusetts had standing to sue the Environmental Protection Agency for failing to regulate greenhouse gas emissions; "EPA's refusal to regulate such emissions 'contributes' to Massachusetts' injuries"); *Lujan*, 504 U.S. at 561–62 (noting that a plaintiff may show "that the action *or inaction* has caused him injury" to establish standing) (emphasis added); *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 158 (3d Cir. 2022) (finding that defendant's "failure to safeguard [plaintiff's] information" made the injury traceable to defendant's conduct).

As alleged in the Complaint, Defendants neglected to act in the wake of *Higgin III* despite being aware that the decision made eligible incarcerated voters unable to exercise their constitutional right to vote.  Compl. ¶¶ 21–27.  After *Higgin III* was issued on December 13, 2022, PLAN and the ACLU spent the better part of a year requesting that Defendants address the deprivation of the fundamental right to vote for these incarcerated voters.  Yet, Defendants did not (and still have not) take any steps even to study the possibility of in-person voting alternatives, let alone implement them.  Only Defendants can remedy the constitutional violation here and ensure in-person voting for this class of voters.  Accordingly, PLAN's concrete injuries are fairly traceable to Defendants' injurious failure to act.

Furthermore, neither PLAN nor its members have broken this causation chain by fulfilling their ethical duties to advise their clients of the possible legal risks present in their casting an absentee ballot in the wake of *Higgin III*.

As a preliminary matter, the Third Circuit has found that simply conveying the effect of injurious conduct does not suffice to break the chain of causation.  *See Hassan v. City of New York*, 804 F.3d 277, 292–93 (3d Cir. 2015) (finding fair traceability to government defendants' conduct where a third party—rather than the government itself—informed plaintiffs of the harm incurred by the challenged governmental action).  By warning members about the potential legal risks associated with voting, PLAN's prison paralegals and jailhouse lawyer-members conveyed the current legal landscape to their clients, relaying legal information in conjunction with its mission. Even if PLAN's injuries, however, were attributable to its own actions (and they are not), the U.S. Supreme Court has found that there exists no "exception to traceability for injuries that a party purposely incurs." *Cruz*, 596 U.S. at 296.

Here, PLAN's members have not voluntarily advised their incarcerated clients of the possible illegality of their voting absentee for the purpose of generating Article III standing.  On the contrary, PLAN has given this advice in good faith, based on PLAN's expertise, reasoned interpretation of the *Higgin III* decision, and deep concern for ensuring its clients and members stay out of harm's way.  PLAN's concern for its clients and desire to advise them in such a way as to prevent potential prosecution is thus not an artificial or self-inflicted injury.  Additionally, this injury is traceable to Defendants' conduct, as PLAN's members would not have been forced to provide this advice regarding potential prosecution to their clients if Defendants took action to assure an alternative, unambiguously legal means of instituting in-person voting.  Accordingly, PLAN's and its members' injuries are traceable to Defendants' conduct.

12

**C. The Requested Relief Is Likely to Redress PLAN's Injuries.**

As discussed *supra*, Defendants' conduct has caused PLAN's and its members' injuries. Accordingly, PLAN's requested relief is likely to redress these injuries by targeting the conduct that has caused the injuries. *See Const. Party of Pa. v. Aichele*, 757 F.3d 347, 368 (3d Cir. 2014) ("[B]y establishing causation, the [plaintiffs] have also established redressability.").

A complaint seeking to enjoin challenged conduct—like here—generally satisfies the redressability requirement. *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 n.5 (1993) ("It follows from our definition of 'injury in fact' that petitioner has sufficiently alleged both that the city's ordinance is the 'cause' of its injury and that a judicial decree directing the city to discontinue its program would 'redress' the injury."); *see also Cruz*, 596 U.S. at 301 (finding that "an order enjoining the Government from taking any action to enforce the" challenged law "would redress appellees' harm"); *Hosp. Council of W. Pa.*, 949 F.2d at 88 (finding that a complaint sufficiently pled redressability because "[s]hould the plaintiffs prevail, the . . . court could enjoin the discriminatory practices about which they complain."); *N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 856 (3d Cir. 2022) (finding that plaintiff organization's "injury would be redressed by . . . an injunction against the enforcement of" the challenged statute); *Hassan*, 804 F.3d at 293 (finding that "an order enjoining the [challenged] policy and requiring non-discriminatory investigation and enforcement would redress the injury.") (quotation omitted) (citation omitted).

Furthermore, PLAN may validly seek injunctive relief that will compel Defendants to *take* certain actions. *See Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 482 (3d Cir. 2018) (finding that plaintiffs had standing to seek injunction requiring defendant to adopt certain corporate policies); *Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832

13

F.3d 469, 481 (3d Cir. 2016) (finding that plaintiff had standing to seek injunction requiring school to take down religious monument).

Specifically, the injunctive relief is likely to (i) end the impairment of PLAN's organizational mission; (ii) allow PLAN to reduce its disproportionate diversion of resources to Delaware; (iii) allow PLAN's prison paralegals and jailhouse lawyers to resume their work; and (iv) assure PLAN's constituents that they will not be disenfranchised or prosecuted or have their votes challenged. Accordingly, PLAN's requested injunctive relief is both valid and will redress the injuries caused by Defendants' conduct.

*     *     *

For all of the above reasons, PLAN has standing to seek from this Court redress on behalf of itself and its member to vindicate them of the injuries suffered as a result of Defendants' inaction in the wake of *Higgin III*.

## II.   THERE IS NO QUESTION OF STATE LAW TO CERTIFY TO THE DELAWARE SUPREME COURT.

Plaintiff opposes certification because there is no unclear question of state law to be certified. The Delaware Supreme Court held that the enumerated categories for permitted absentee voting in Art. 5, Section 4A of the Delaware Constitution ("Section 4A") are "exhaustive," "comprehensive," and cannot be "enlarge[d]." *Higgin III*, 295 A.3d at 1092, 1093. Neither "incarceration" nor "detention" are enumerated in Section 4A. Regardless of Defendants' assertions that incarcerated voters may continue to use absentee voting despite not falling under Section 4A, *Higgin III* is not a mere suggestion from the Delaware Supreme Court about how to apply the provisions of Delaware's constitution, and Defendants cannot decide whether it applies. "[I]t is ultimately the provisions of our laws . . . by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). While Defendants may act as if *Higgin III* does not

14

say what it says, that position alone cannot engineer ambiguity where there is none.

With the 2024 election imminently approaching, moreover, there is a profound risk of harm to the fundamental right to vote for eligible incarcerated voters in Delaware if Defendants' further delay is permitted by this Court. Therefore, if this Court disagrees with Plaintiff that certification is not warranted, Plaintiff requests that the certificate emphasize the urgency of the question in light of the imminent 2024 elections. If upon certification the Delaware Supreme Court holds that incarceration is not among the Delaware Constitution's "exhaustive" list of reasons to vote absentee, then Plaintiff asks this Court to immediately observe that incarcerated, eligible Delawareans face unconstitutional disenfranchisement under the Defendants' regime and issue a preliminary injunction requiring Defendants to provide a constitutional method of voting to these voters ahead of the 2024 elections.

### A. Legal Standard

Certification is a rare process by which courts may remit "the parties to the state court to resolve the controlling state law on which the federal rule may turn." *Lehman Bros. v. Schein*, 416 U.S. 386, 390–91 (1974) (citation omitted). Mere "doubt as to local law" does not oblige certification. *Id*. In the Third Circuit, a court should consider "several factors which will counsel whether certification is appropriate." *United States v. Defreitas*, 29 F.4th 135, 141 (3d Cir. 2022). These factors include: (i) whether the question's eventual resolution is unclear and controls an issue in the case, (ii) the "importance" of the question, and (iii) judicial economy. *Id*. at 141–42. These factors do not support certification here.[7]

---

[7] Plaintiff notes that abstention and certification are closely related concepts. *Lehman Bros. v. Schein*, 416 U.S. 386, 394 (1974) (Rehnquist, J., concurring). As articulated in Plaintiff's Reply Brief, voting rights cases are generally inappropriate for abstention and particularly so in the context of a rapidly approaching election. Pl.'s Reply Br. 1–3. Therefore, this Court should consider certification similarly inappropriate in the voting rights context.

**B. Delaware State Law is Clear.[8]**

The Delaware Supreme Court recently held that Delaware's constitutionally enumerated categories for permitted absentee voting is "exhaustive," "comprehensive," and cannot be "enlarge[d]." *Higgin III*, 295 A.3d at 1092, 1093. Neither "incarceration" nor "detention" are enumerated in the state constitution. The Delaware Supreme Court has thus already answered the question Defendants seek to certify. It is not appropriate to certify a question where, as here, one can "predict how the highest state court would decide the issue" based on existing state court decisions. *Baker v. Croda Inc.*, 2022 WL 19010312, at *3 (3d Cir. Oct. 21, 2022); *see also Defreitas*, 29 F.4th at 141 ("Certifying a question where the answer is clear is inappropriate and unnecessary . . . [considerations of the clarity and dispositive nature of the question] will often be dispositive.").

Further, the *Higgin III* court interpreted the very categories that the certified question would ask them to interpret: It interpreted "business or occupation" to mean "certain persons in the work force" and "sickness or physical disability" to mean "disabled voters." *Higgin III*, 295 A.3d at 1092. Neither definition leaves open the broad, unsupported interpretation unilaterally offered by Defendants. To be clear, *Higgin III* adopted the restrictive reasoning of a Delaware Supreme Court 1972 advisory opinion which articulated that by "expressly including certain classifications, the drafters of [Section] 4A impliedly excluded all other classifications" not "specifically enumerate[d]" within Section 4A. *Id.* at 1092–93 (citing *Opinion of the Justices*, 295 A.2d 718, 722 (Del. 1972) (ultimately advising that an attempt to expand absentee voting without amending the constitution was an unconstitutional enlargement upon the business or occupation

---

[8] Plaintiff incorporates by reference its arguments in its prior briefing on this issue. *See* D.I. 10 at 10–11; D.I. 25 at 2–3.

16

category)).  Simply put, *Higgin III* leaves no room to interpret the Section 4A categories to include incarceration or detention as a *categorical* reason to vote absentee.

Defendants' stance—that incarcerated voters may simply ignore *Higgin III* and vote at risk of challenge or prosecution—lacks any basis in Delaware precedent or the plain meaning of Section 4A.  Defendants do not suggest, nor could they, that incarceration is either a "disability" or an "occupation" in common usage, in Delaware case law, or in the Delaware Code.[9]  In sum, there is *no* authority for Defendants' interpretation.  The state law issue is clear and thus should not be certified.

### C. Certification Would Unnecessarily Exhaust Judicial Resources and Harm Plaintiff and its Members.

In the present litigation, the harmful impact of delay on Plaintiff and its members, particularly given the unwillingness of Defendants to reasonably address this issue over the course of the last year and a half, weigh against certification.

Certification "entails more delay and expense than would an ordinary decision of the state question on the merits by the federal court"; as such, the Court should decline to certify  when there are concerns about delay or expense, even if it deems certification otherwise appropriate. *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 796 F. Supp. 117, 119–20 (D. Del. 1992).

Certification would essentially eliminate any chance of Plaintiff obtaining relief ahead of the November 2024 elections.  For starters, the Delaware Supreme Court can reject any petition

---

[9] To support the notion that Section 4A's categories can be interpreted to include incarceration, Defendants point to dicta in *O'Brien v. Skinner* discussing incarcerated voters in New York.  D.I. 21 at 8 (citing 414 U.S. 524, 528 (1974)).  New York law is inapplicable to Delaware's absentee categories. Regardless, *O'Brien* made clear that it is the function of the highest court of a state to articulate the contents of that state's law.  *O'Brien*, 414 U.S. at 531.  Given that the Delaware Supreme Court already has articulated the state's absentee law in *Higgin III*, its interpretation is definitive.

17

for certification, meaning that there is no guarantee that the Court will even address this issue.  *See* Del. R. Sup. Ct. 41(c)(iv) (Delaware Supreme Court must first "determine whether to accept or refuse the certification.").  If the petition is rejected, then the parties will be exactly in the same place as they are now—only with far fewer days in which to address these constitutional rights before the November elections.

Defendants' brief is due to this Court only four months out from the November 5, 2024 general election.  To ensure that Plaintiff has a chance to remedy the constitutional violation ahead of that November 2024 election, the following would need to occur in the intervening weeks: (1) this Court would need to review the parties' briefs and issue a ruling that it will petition for certification; (2) the Delaware Supreme Court would need to review the petition and any accompanying materials; (3) the Delaware Supreme Court would need to issue an order granting certification, a decision for which there is no required timeframe and which is made at "the discretion of the Court," Del. R. Sup. Ct. 41(b); (4) the Delaware Supreme Court would need to issue a staggered briefing schedule, *see id.* 41(c)(v); (5) the parties would need to prepare and submit those briefs; (6) the Delaware Supreme Court would need to hold argument or choose to forego it; (7) the Delaware Supreme Court would need to issue a ruling on the question presented, another decision for which the Delaware Supreme Court Rules contemplate no required timeframe; and (8) this Court would need to assume jurisdiction and grant a preliminary injunction. Meanwhile, Defendants will be administering in-person and absentee elections for an intervening Primary Election, as well as preparing for the General Election for all other eligible voters, rather than addressing the urgent needs of Plaintiff.

This highly improbable timeline is tantamount to denying Plaintiff's motion for a preliminary injunction and denying eligible voters the right to vote.  At the very least, neither

Defendants nor this Court can provide Plaintiff with any assurance that the Delaware Supreme Court will decide this issue, first presented to Defendants in 2022, before the 2024 elections. *See Fiat Motors of N. Am., Inc. v. Mayor & Council of City of Wilmington*, 619 F. Supp. 29, 39 (D. Del.), *certified question answered*, 498 A.2d 1062 (Del. 1985) (certification from this Court to the Supreme Court of Delaware issued in February of 1985 and answer from the Delaware Supreme Court delivered in September of 1985 despite the District Court's representation that resolution of the questions "will have a major impact on state policy").[10]

Further, Third Circuit courts consider the "actions of the parties" when deciding whether to certify. *Defreitas*, 29 F.4th at 142. Judicial economy principles counsel against burdening litigants by "delay[ing] . . . the case's resolution" through certification. *Id.*; *see also Remington Arms Co.*, 796 F. Supp. at 120. Defendants have been aware of *Higgin III* and its impact on incarcerated voters since Plaintiff's multiple demands beginning in 2022. In fact, if Defendants sincerely wanted clarification from the Delaware Supreme Court, Defendant Carney could have unilaterally requested an advisory opinion from the Delaware Supreme Court rather than wait to seek certification from this Court. 10 Del. C. § 141(a) (1972); *Opinion of the Justices*, 295 A.2d 718 (Del. 1972).[11] Instead, Defendants have done nothing for almost a full year to ensure that

---

[10] Plaintiff further notes that Defendants waived any argument in favor of certification by failing to raise it in their opposition to Plaintiff's motion for a preliminary injunction. *See* D.I. 21. The question of whether a question should be certified to the state supreme court is non-jurisdictional because it does not implicate subject-matter jurisdiction, and therefore it is waived if not timely raised. *See, e.g.*, *Gutierrez v. Johnson & Johnson*, 523 F.3d 187, 197 (3d Cir. 2008); *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).

[11] Federal courts have found grounds to infer legal interpretations where a party could have, yet failed to, pursue an advisory opinion. *See Wersal v. Sexton*, 613 F.3d 821, 830 (8th Cir. 2010) (reversed on other grounds) ("[t]hat the appellees did not [pursue an advisory opinion] indicates that the clause more than likely does apply"). Defendant Carney's failure to seek an advisory opinion should be considered both an indicator of the weakness of Defendants' interpretation that incarceration is included as a Section 4A category and a source of unnecessary consternation and

eligible incarcerated voters do not risk prosecution or voter challenge through their absentee regime.  At this point, further delay would inequitably reward Defendants' delay tactics and prevent Plaintiff from getting relief in time for their clients to exercise their voting rights in the 2024 election.[12]

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectively requests that this Court find that Plaintiff has standing to bring this action, decline to unnecessarily issue a petition for certification to the Delaware Supreme Court that would unduly delay Plaintiff's requested relief, and grant Plaintiff's motion for a preliminary injunction.

---

delay in the resolution of this legal dispute that should prevent certification as a matter of judicial economy.

[12] Should this Court determine that a petition for certification is warranted, such a question should state with particularity the important and urgent reasons for an immediate determination and present a single, dispositive question for the Court to consider.  Del. Sup. Ct. R. 41(b); *see Remington*, 796 F. Supp. at 120. In this scenario, and to comply with Del. Sup. Ct. R. 41(b), Plaintiff would propose the following question: *In light of the holding in* <u>Albence v. Higgin</u>*, 295 A.3d 1065 (Del. 2022), are incarcerated voters who are otherwise eligible to vote legally permitted to vote by absentee ballot under Del. Const. Art. 5 § 4A, notwithstanding the fact that "incarceration" is not explicitly listed?*

/s/ Emily S. DiBenedetto

OF COUNSEL:

Jonathan Topaz
Casey Smith
Sophia Lin Lakin
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION, INC.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 249-2500

Stephen D. Hibbard
Aaron M. Francis
Seth H. Victor
Dixie M. Morrison
PROSKAUER ROSE LLP
2029 Century Park E. #2400
Los Angeles, CA 90067
(310) 284-5600

Michael J. Lebowich
Godfre O. Blackman
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
(212) 969-3000

Dated: June 20, 2024

Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com

-and-

Dwayne J. Bensing (No. 6754)
Andrew Bernstein (No.7161)
AMERICAN CIVIL LIBERTIES UNION
 OF DELAWARE
100 W. 10 Street, Suite 706
Wilmington DE 19801
(302) 295-2113
dbensing@aclu-de.org
abernstein@aclu-de.org

*Attorneys for Plaintiff*